**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ehorne@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

STACY PENNING, individually and on behalf of all others similarly situated,

Plaintiff,

v.

INSURANCE ZEBRA, INC., d/b/a THE ZEBRA

Defendant.

Case No. 3:25-cv-03531-WHO

**FIRST AMENDED CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Stacy Penning ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Insurance Zebra, Inc., d/b/a The Zebra ("Defendant" or "The Zebra"). Plaintiff brings this action based upon personal knowledge of the facts specifically pertaining to himself, and on information and belief as to all other matters, by and through the investigation of the undersigned counsel.

## NATURE OF THE ACTION

1. This class action lawsuit is brought on behalf of all California residents who have accessed and used Defendant's web-based insurance comparison service, thezebra.com (the "Website"), to search for, obtain, or compare different insurance quotes (the use of the Website known as "The Zebra Service").

2. Defendant aids, employs, agrees, and conspires with third parties Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook") and Google LLC ("Google" and together with Facebook, the "Third Parties") to intercept communications sent and received by Plaintiff and Class Members, including communications containing protected personal information related to insurance. Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions. By failing to procure consent before enabling Facebook and Google's interception of these communications, and by disclosing such information to Facebook and Google, Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. 2511, *et seq.* ("ECPA"), the California Invasion of Privacy Act sections 631and 632, and the California Constitution.

## PARTIES

3. ***Plaintiff.*** Plaintiff Stacy Penning is a citizen of the State of California over the age of 18, and lives in El Cerrito, California with an intent to remain there. Plaintiff Penning is therefore a resident of California.

4. Plaintiff Penning first used The Zebra Service on the Website to search for, obtain, and compare price quotes from multiple insurance providers in January 2025.

5. When Plaintiff Penning used the Website to view or purchase insurance, Defendant intercepted his confidential communications. Defendant then disclosed this information in conjunction with Plaintiff Penning's personally identifiable information ("PII") to Facebook and

Google. Specifically, as a result of Defendant's unlawful conduct as alleged herein, Facebook and Google helped Defendant intercept and collect information about Plaintiff Penning's PII and his confidential communications with the Website.

6. At all relevant times, Plaintiff Penning never consented to, agreed to, or otherwise permitted Defendant to disclose his personally identifiable information or insurance information obtained through The Zebra Service to third parties, including to Facebook and Google.

7. Likewise, Defendant never gave Plaintiff Penning the opportunity to prevent the disclosure of his personally identifiable information or insurance information obtained through The Zebra Service to Facebook and Google.

8. Plaintiff Penning has an active Facebook account, which he has maintained for approximately ten years. Plaintiff Penning routinely logged onto his Facebook account on the same web browser he used to access Defendant's Website. When creating his Facebook account, Plaintiff Penning provided Facebook with his PII, including his name, email address, date of birth, residency, and gender.

9. Plaintiff Penning has an active Google account, which he has maintained for approximately twelve years. During that time, Plaintiff Penning routinely logged onto his Google account on the same web browser he used to access Defendant's Website. When creating his Google account, Plaintiff Penning provided Google with his PII, including his name and date of birth. Google also collected information related to his browser and device every time he logged into his Google account, including his IP address and other information related to his device.

10. Pursuant to the systematic process described herein, Defendant assisted Facebook and Google with intercepting Plaintiff Penning's protected communications on the Website without his consent, including those that contained personally identifiable information and insurance information.

11. By failing to receive the requisite consent from Plaintiff Penning, Defendant breached its duties of confidentiality and unlawfully disclosed Plaintiff Penning's protected personal information and personally identifiable information to Facebook and Google.

12. ***Defendant.*** Insurance Zebra, Inc., d/b/a The Zebra is incorporated under the laws of Delaware and has its principal place of business in Austin, Texas. Defendant owns and operates the insurance comparison website nationwide and found at thezebra.com. Defendant chose to embed the tracking technology provided by Facebook and Google onto its Website, as described more thoroughly below.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from the defendant.

14. This Court has personal jurisdiction over Defendant because Defendant purposefully availed itself of this forum by conducting substantial business within California such that Defendant has significant, continuous, and pervasive contacts with the State of California.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiff's claim took place within this District.

## FACTUAL ALLEGATIONS

### I. OVERVIEW OF THE LAW

#### A. California Information Privacy Act

16. The California Information Privacy Act ("CIPA"), Cal. Penal Code §§ 630, *et seq*., prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

17. To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> Or
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> Or
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

18. Section 631(a)'s applicability is not limited to phone lines but also applies to "new technologies" such as computers, the internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

19. As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and

without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

20. A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

21. Individuals may bring an action against the violator of CIPA §§ 631 and 632. Under Cal. Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

**B. California Insurance Information and Privacy Protection Act**

22. The California Legislature enacted the Insurance Information and Privacy Protection Act (IIPPA), Cal. Ins. Code § 791, to "establish standards for the collection, use and disclosure of information gathered in connection with insurance transactions by insurance institution, … to maintain a balance between the need for information by those conducting the business of insurance and the public's need for fairness in insurance information practices, including the need to minimize intrusiveness [and] to limit the disclosure of information collected in connection with insurance transactions." Importantly, the Act creates privacy protections for individuals in insurance transactions by regulating how the insurance industry collects, uses, and discloses personal information.

23. The IIPPA prohibits the unauthorized disclosure of "any personal or privileged information about an individual collected or received in connection with an insurance transaction." Cal. Ins. Code § 791.13. "Personal information" is defined as "any individually identifiable information gathered in connection with an insurance transaction from which judgments can be made about an individual's character, habits, avocations, finances, occupation, general reputation, credit, health, or any other personal characteristics[, including] an individual's name and address and 'medical record information.'" Cal. Ins. Code § 791.02(s).

24. As relevant here, California has a strong and explicit legislative intent to protect Californians from the disclosure of personal information that is shared through insurance transactions.

### C. The Gramm-Leach-Bliley Act and California Financial Information Privacy Act

25. As Congress and the California Legislature recognized, "nonpublic personal information" is confidential.

26. Per 16 C.F.R. § 313.3(n):

(1) Nonpublic personal information means:

(i) Personally identifiable financial information; and

(ii) Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.

27. Per 16 C.F.R. § 313.3(o):

(1) Personally identifiable financial information means any information:

(i) A consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution];

(ii) About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or

(iii) [A financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer.

(2) Examples—(i) Information included. Personally identifiable financial information includes:

(A) Information a consumer provides to [a financial institution] on an application to obtain a loan, credit card, or other financial product or service;

(B) Account balance information, payment history, overdraft history, and credit or debit card purchase information;

(C) The fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution];

> (D) Any information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer;
>
> (E) Any information that a consumer provides to [a financial institution] or that [a financial institution]or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account; and
>
> (F) Any information [a financial institution] collect[s] through an Internet "cookie" (an information collecting device from a web server).

28. Pursuant to 16 C.F.R. § 313.3(k)(1):

> a financial institution "means any institution the business of which is engaging in an activity that is financial in nature or incidental to such financial activities as described in section 4(k) of the Bank Holding Company Act of 1956, 12 U.S.C. 1843(k). An institution that is significantly engaged in financial activities, or significantly engaged in activities incidental to such financial activities, is a financial institution."

29. Pursuant to 16 C.F.R. § 313.3(k)(1), Truist is a financial institution.

30. In passing CalFIPA, the California Legislature "intend[ed] for financial institutions to provide their consumers notice and meaningful choice about how consumers' nonpublic personal information is shared or sold by their financial institutions[]" and "inten[ded] . . . to afford persons greater privacy protections than those provided in Public Law 106-102, the federal Gramm-Leach-Bliley Act[.]" Cal. Fin. Code § 4051(a)-(b).

31. Cal. Fin. Code § 4052(a) provides that:

> "Nonpublic personal information" means personally identifiable financial information (1) provided by a consumer to a financial institution, (2) resulting from any transaction with the consumer or any service performed for the consumer, or (3) otherwise obtained by the financial institution. Nonpublic personal information does not include publicly available information that the financial institution has a reasonable basis to believe is lawfully made available to the general public from (1) federal, state, or local government records, (2) widely distributed media, or (3) disclosures to the general public that are required to be made by federal, state, or local law. Nonpublic personal information shall include any list, description, or other grouping of consumers, and publicly available information pertaining to them, that is derived using any nonpublic personal information other than publicly available information, but shall not include any list,

> description, or other grouping of consumers, and publicly available information pertaining to them, that is derived without using any nonpublic personal information.

32. According to Cal. Fin. Code § 4052(b):

> "Personally identifiable financial information" means information (1) that a consumer provides to a financial institution to obtain a product or service from the financial institution, (2) about a consumer resulting from any transaction involving a product or service between the financial institution and a consumer, or (3) that the financial institution otherwise obtains about a consumer in connection with providing a product or service to that consumer. Any personally identifiable information is financial if it was obtained by a financial institution in connection with providing a financial product or service to a consumer. Personally identifiable financial information includes all of the following:
>
> (2) Account balance information, payment history, overdraft history, and credit or debit card purchase information.
>
> (3) The fact that an individual is or has been a consumer of a financial institution or has obtained a financial product or service from a financial institution.
>
> (4) Any information about a financial institution's consumer if it is disclosed in a manner that indicates that the individual is or has been the financial institution's consumer.
>
> (5) Any information that a consumer provides to a financial institution or that a financial institution or its agent otherwise obtains in connection with collecting on a loan or servicing a loan.
>
> (6) Any personally identifiable financial information collected through an Internet cookie or an information collecting device from a Web server.

33. "Except as provided in Sections 4053, 4054.6, and 4056, a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates." Cal. Fin. Code § 4052.5.

34. Thus, Plaintiff's and Class Members' "nonpublic personal information" is confidential, under both federal and California law. Nonetheless, such information was intercepted in transit by the Facebook Tracking Pixel and Google Analytics—as enabled by Defendant—and

none of the parties, Defendant, Facebook, or Google procured Plaintiff's and Class Members' consent prior to this interception.

35. This pattern of conduct by Defendant flouts the GLBA's and CalFIPA's respective purposes of enhancing "financial privacy[.]"[1]

## II. OVERVIEW OF THE PARTIES

### A. Defendant Enables Consumers To Purchase Insurance

36. Defendant owns and operates the Website, which sells insurance policies to consumers across the United States. Defendant provides its users with the ability to compare insurance rates and "streamline[s] [users'] research process by delivering personalized insurance quotes from top companies."[2] Defendant works with over a hundred insurance companies to offer insurance policies to users, and Defendant has a team of over a hundred licensed agents to help users select the right policy.

37. To use Defendant's Website, a user must first share what type of insurance they are looking for (*e.g.*, home, car, or pet insurance) then share any additional relevant information (*e.g.*, zip code, the car's make and model, or pet breed). After sharing their personal information, the user "sit[s] back while [Defendant's] algorithm gets to work finding [the user] the best policy."[3] Last, Defendant provides quotes for different insurance policies and the user can choose and purchase whichever policy best fits their needs.

38. According to Defendant, it monetizes its Website in one of two ways. First, if a user purchases a policy through one of its licensed insurance agents, Defendant makes a commission.[4] Second, if a user purchases a policy from one of the quotes Defendant provided, then Defendant makes a commission from the insurance company that provided the policy. Defendant states that it "doesn't earn money by selling [users'] data to a bunch of insurance

---

[1] http://www.leginfo.ca.gov/pub/03-04/statute/ch_0201-0250/ch_241_st_2003_sb_1. *See also* https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=200320040SB1.

[2] Kristine Lee, *How to Get a Car Insurance Quote*, THEZEBRA (April 10, 2025), https://www.thezebra.com/car-insurance-quotes/.

[3] *How Does The Zebra Work?*, THEZEBRA, https://www.thezebra.com/about/how-the-zebra-works/.

[4] *Id.*

companies" and is adamant that it "never sell[s] [user'] information. [The Zebra] mean[s] it."[5] However, as discussed below, Defendant *does* provide users' personal information to third parties without users' knowledge or consent.

**B. The Zebra Service Integrated Third Party Pixels**

**1. <u>The Facebook Tracking Pixel</u>**

39. Per Plaintiff's counsel's investigation, Defendant intercepts and discloses to Facebook individual users' personally identifiable information in the form of their Facebook account and the contents of the communications users have with the Website. This is achieved through Defendant's integration of a piece of code called a tracking pixel (the "Facebook Pixel") onto the Website.

40. A research paper presented at the Association for Computing Machinery Web Conference in 2023 states that "[a tracking pixel] is a piece of JavaScript code added to a website as a graphic element[, ] 1 × 1 pixel [in size,] that is loaded when a user lands on the website hosting it."[6] "When a user visits a [tracking pixel]-enabled website, an instance of the [tracking] pixel loads in the HTML code of the page on the browser."[7] "[I]f a corresponding … cookie does not exist on the browser, one is created and a unique ID is saved[.]"[8] Then, the tracking pixel's "embedded [] URL point[s] to [a third party's (i.e., Facebook)] servers[] … [and] report[s] to [the third party (*i.e.*, Facebook)] the user['s] activity for the duration of the visit[,]" along "with [the] specific ID reflecting the specific [website user. This] can be used [] to track [] audiences for brand ads[.]"[9]

41. To implement a tracking pixel, a website administrator simply places on their website "[t]he [b]ase [tracking p]ixel code[, which] is a small segment of JavaScript code [that]

---

[5] *Id.*

[6] Paschalis Bekos et al., *The Hitchhiker's Guide to Facebook Web Tracking with Invisible Pixels and Click IDs*, at 2, (2023) ARXIV, https://arxiv.org/pdf/2208.00710.

[7] *Id.*

[8] *Id.*

[9] *Id.*

acts as an 'initiator' for the [tracking p]ixel['s] behavior."[10] Once active, this code will load "a library of functions [(*i.e.*, fbevents.js for the Pixel] … on the website[.] … This library is the core mechanism[s] of the FB Pixel."[11] In addition, "the webpage administrator [] define[s] … the behavior they wish to track and report to [Facebook], by defining *events*, *i.e.*, actions, that a user takes on the website."[12] When in use, the tracking pixel then "reports to [Facebook] information about [each] event and [the] user that caused it," for Facebook's "future use in ad-conversion and further user profiling and tracking[.]"[13]

42. Defendant discloses users' personally identifying information and the contents of their communications to Facebook so that it can obtain the marketing, advertising, and analytics technological tools that Facebook provides. Facebook describes itself as a "real identity platform,"[14] meaning users are allowed to "create only one account using the name they go by in everyday life that represents their authentic identity."[15] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[16]

43. In 2024, Facebook generated $164.5 billion in revenue.[17] Approximately $160.6 billion of that was earned through advertising.[18]

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] Sam Schechner & Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, THE WALL STREET JOURNAL (Oct. 21, 2021), https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701.

[15] *Authentic Identify Representation*, META, https://transparency.meta.com/policies/community-standards/authentic-identity-representation (last accessed Feb. 4, 2025).

[16] *Create A New Account*, FACEBOOK, https://www.facebook.com/reg/ (last accessed Feb. 4, 2025).

[17] *Meta Reports Fourt Quarter and Full Year 2024 Results*, META (Jan. 29, 2025), https://investor.atmeta.com/investor-news/press-release-details/2025/Meta-Reports-Fourth-Quarter-and-Full-Year-2024-Results/default.aspx.

[18] *Id.*

44. Facebook sells advertising space by highlighting its ability to target users.[19] Facebook can target users so effectively because it surveils user activity both on and off its site.[20] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[21] Facebook compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[22]

45. Advertisers can also build "Custom Audiences."[23] Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[24] With Custom Audiences, advertisers can target existing customers directly, and they can also build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[25] Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[26]

---

[19] *Why Advertise On Facebook, Instagram and Other Meta Technologies*, META, https://www.facebook.com/business/help/205029060038706 (last accessed Feb. 4, 2025).

[20] *About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last accessed Feb. 4, 2025).

[21] *Audience Ad Targeting*, META, https://www.facebook.com/business/ads/ad-targeting (last accessed Feb. 4, 2025).

[22] META, https://www.facebook.com/business/news/Core-Audiences (last accessed Feb. 18, 2025).

[23] *About Custom Audiences*, META, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last accessed Feb. 4, 2025).

[24] *Audience Ad Targeting*, META, https://www.facebook.com/business/ads/ad-targeting (last accessed Feb. 4, 2025).

[25] *About Lookalike Audiences*, META, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last accessed Feb. 4, 2025).

[26] *Create A Customer List Custom Audience*, META, https://www.facebook.com/business/help/170456843145568?id=2469097953376494 (last accessed Feb. 4, 2025); *Create A Website Custom Audience*, META, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last accessed Feb. 4, 2025).

46. As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[27] Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

47. The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[28] Facebook's Business Tools can also track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[29] Advertisers can even create their own tracking parameters by building a "custom event."[30]

48. Facebook offers the Facebook Pixel as a Business Tool to advertisers, like Defendant, to integrate into their websites. The Facebook Pixel "tracks the people and type of actions they take."[31] When a user accesses a website hosting the Facebook Pixel, Facebook's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Facebook's servers. This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Facebook Pixel is configured to collect.

---

[27] *The Meta Business Tools*, FACEBOOK, https://www.facebook.com/help/331509497253087 (last accessed Feb. 4, 2025).

[28] *See Meta Pixel: Advanced*, META, https://developers.facebook.com/docs/facebook-pixel/advanced/ (last accessed Feb. 4, 2025); *see also Best Practices For Meta Pixel Setup*, META, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last accessed Feb. 4, 2025); *Marketing API: App Events API*, META, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last accessed Feb. 4, 2025).

[29] *Specifications For Meta Pixel Standard Events*, META, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last accessed Feb. 4, 2025).

[30] *About Standard And Custom Website Events*, META, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last accessed Feb. 4, 2025); *see also Marketing API: App Events API*, META https://developers.facebook.com/docs/marketing-api/app-event-api/.

[31] *Retargeting*, META, https://www.facebook.com/business/goals/retargeting.

This transmission is initiated by Facebook code concurrently with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code, and Facebook's embedded code.

49. Defendant chose to include the Facebook Pixel on its Website.

50. Facebook's own documentation makes clear just how much tracking of private information the Facebook Pixel does. It describes the Facebook Pixel as code that Facebook's business customers can put on their website to "[m]ake sure your ads are shown to the right people. ***Find … people who have visited a specific page or taken a desired action on your website***."[32]

51. Facebook instructs such business customers that:

> Once you've set up the [Facebook Tracking] Pixel, ***the pixel will log when someone takes an action on your website***. Examples of actions include adding an item to their shopping cart or making a purchase. ***The Pixel receives these actions, or events***, which you can view on your [Facebook Tracking] Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. ***You'll also have options to reach those customers again through future Meta ads***.[33]

52. The Facebook Pixel code enables Facebook not only to help Defendant with advertising to its own users outside the Website, but also to include individual users among groups targeted by ***other*** Facebook advertisers relating to the conditions about which users communicated on Defendant's Website.

53. Facebook's Business Help Center explains:

> Meta ***uses marketing data to show ads to people who are likely to be interested in them***. One type of marketing data is website events, which are ***actions that people take on your website***.[34]

---

[32] *About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (emphasis added).

[33] *Id.* (emphasis added).

[34] *About Standard And Custom Website Events*, META, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added).

54. In other words, Facebook sells advertising space by highlighting its ability to target users.[35] Facebook can target users so effectively because it surveils user activity both on and off its site.[36] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "location," and "people who share interests with … current customers."[37]

55. An example illustrates how the Facebook Pixel works. Take an individual who navigates to Defendant's Website and inputs the requested information to compare insurance rates. When the user then clicks to the next step, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage. Because The Zebra Service integrated and utilizes the Facebook Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. Facebook causes the browser to secretly duplicate the communication with Defendant, transmitting it to Facebook's servers, alongside additional information that transcribes the communication's content and the individual's identity.

56. After collecting and intercepting the information described in the preceding paragraph, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

### 2. Google's Tracking Services

57. Per Plaintiff's counsel's investigation, Defendant also intercepts and discloses to Google PII and the contents of users' communications from the Website. This is achieved through Defendant's integration of Google's services onto the Website.

58. Defendant chose to integrate Google's tracking services onto the Website.

59. Google offers a range of advertising software that have the capability to track Website users, one of which is called Google Analytics.

---

[35] *Why Advertise On Facebook, Instagram And Other Meta Technologies*, META, https://www.facebook.com/business/help/205029060038706.

[36] *About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[37] *Audience Ad Targeting*, META, https://www.facebook.com/business/ads/ad-targeting.

60. "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights" for businesses.[38] This is made possible by a piece of code installed on a website that collects information on how website and app users interact with a business' website, including "how many users bought an item . . . by tracking whether they made it to the purchase-confirmation page."[39]

61. Google advertises that this service can "[m]onitor activity on your site as it happens."[40] Meaning, in real time.

62. Pivotal to the functioning of Google's services, Google's business model involves entering voluntary partnerships with various companies and surveilling communications on their partners' websites with Google Analytics.

63. Thus, through websites that employ Google's services, Google directly receives the electronic communications of website visitors entered the website.

64. That information is then analyzed by Google before it is provided to any entity that was a party to the conversation (like Defendant). In order to conduct this analysis, Google views the information in real time when the data is processed in its servers.

65. Once Google intercepts website or app communications, it has the capability to use such information for its own purposes. "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps."[41]

66. Google's range of software services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits. This involves collecting visitor information from thousands

---

[38] *Analytics Help: How Google Analytics Works*, GOOGLE, https://support.google.com/analytics/answer/12159447?hl =en&ref_topic=14089939&sjid=2827624563183915220-NC.

[39] *Id.*

[40] *The Finer Points*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/.

[41] *Privacy and Terms*, GOOGLE, https://policies.google.com/technologies/partner-sites.

of websites and then analyzing that information to /group web users so they can be targeted for products or services based on their interests.

67. Here, to engage in analyzing the collected data to deliver targeted advertising, Google regularly viewed and used the personal information inputted by Plaintiff and Class Members on the Website and collected by the Google Analytics code.

68. Information from websites, like Defendant's, is central to Google's ability to successfully market their advertising capabilities to future clients.

69. In sum, Google has the capability to use the Website communications to: (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

70. Yet another type of PII obtained from Website users by Google, and subsequently viewed by Google, is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

71. These browser-fingerprints provide a wide variety of data and can be used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[42] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[43] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

---

[42] Justin Schuh, *Building a more Private Web*, GOOGLE (Aug. 22, 2019), https://www.blog.google/products/chrome/building-a-more-private-web/.

[43] Chris Hauk, *What is Browser Fingerprinting? How it Works and How to Stop it*, PIXELPRIVACY (Apr. 11, 2024), https://pixelprivacy.com/resources/browser-fingerprinting/.

72. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users. [44]

73. Browser-fingerprints are personal identifiers, and Google's services can collect browser-fingerprints from website visitors.

74. Defendant uses and causes the disclosure of data sufficient for third parties, like Google, to create a browser-fingerprint identifier with each communication Website users have with the Website.

75. Google also offers a Marketing Platform that creates a "unified advertising and analytics platform for smarter marketing and better results."[45] As part of its platform, Google offers the Floodlight Conversion Tracking System which "consist of tags that track activity on [a] site, along with reporting features for adding conversion data to [] reports."[46] Floodlight works by tracking a "Floodlight activity" which is a "specific conversion" a website or app owner wants to track "such as . . . a visit to a page on [a] site."[47] Once a visitor conducts the tracked activity, a website tag reports the conversion to Floodlight.[48]

76. Floodlight uses "a cookie to recognize repeat visits from a specific browser."[49] Through the use of cookies, Google's advertising services, like Floodlight, can provide "personalized advertising" to an individual based on their actions on websites and apps[50]

---

[44] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Feb. 27, 2017), https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

[45] GOOGLE MARKETING PLATFORM, https://marketingplatform.google.com/about/ (last accessed Feb. 19, 2025).

[46] GOOGLE, REPORT ON FLOODLIGHT CONVERSIONS, https://support.google.com/searchads/answer/7298761?hl=en&ref_topic=6054260&sjid=11536244677443819800-NC.

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] GOOGLE, HOW GOOGLE MARKETING PLATFORM ADVERTISING PRODUCTS AND GOOGLE AD MANAGER USE COOKIES, https://support.google.com/searchads/answer/2839090?sjid=11536244677443819800-NC.

77. A website or app owner can also use Floodlight in a way that allows the "information associated with cookies used in advertising [to] be added to the user's Google Account."[51] Therefore, the cookies used for the Floodlight services gather PII because the information gathered can be connected to a particular individual's Google Account.

## III. DEFENDANT KNOWINGLY DISCLOSES USERS' PERSONAL INFORMATION FOR THE PURPOSES OF MARKETING, ADVERTISING, AND ANALYTICS

78. Through the Facebook Pixel and Google's tracking services, Defendant disclosed Plaintiff's confidential communications to Google and Facebook.

### A. Defendant Discloses Users' Protected Personal Information to Facebook

79. When a user inputs their personal information on the Website, Defendant discloses to Facebook, through the Facebook Tracking Pixel, the contents of the communication. For example, the following screenshot of the network traffic shows Defendant sending to Facebook the following transmission of a user searching for home insurance. In the Universal Resource Locator ("URL") of the request, red squares highlight that the individual users: (i) viewed a page on www.thezebra.com (denoted by the "ev=PageView") and (ii) applied for home insurance—as an owner—to compare quotes.

[51] *Id.*

PageView

ADVANCED MATCHING PARAMETERS SENT

**external_id**: Show

DATA PROCESSING PARAMETERS SENT

**dpo**:

Since Data Processing Options are sent, custom conversions or catalog feedback may not work. Learn more

EVENT INFO

**Setup Method**: Manual
**URL called**: Hide

https://www.facebook.com/tr/?id=776429362447999&ev=PageView&dl=https%3A%2F%2Fwww.thezebra.com&rl=https%3A%2F%2Fwww.thezebra.com&if=false&ts=1744935531993&sw=1920&sh=1080&ud[external_id]=a257cd0123f9af66b50a6c5ea7c79044a72d0923319146323ef981ea9d8872fe&v=2.9.198&r=stable&ec=0&o=12316&fbp=fb.1.1744405902094.998662892472332572&pm=1&hrl=1447db&cdl=API_unavailable&it=1744935531289&coo=false&dpo=&cs_cc=1&cas=9302455971008887%2C1173152686080623%2C6231769476948078%2C4817185188310410%2C2967802623338403%2C3180764668602226%2C2816546648393602%2C4199291936751230%2C2768898739890096%2C2925331067528449%2C2481472778625932%2C2620721371323376%2C2545184992237714%2C2303967759721311%2C2268355336573627%2C2203687509686117%2C2407302499290885%2C2674626765940889%2C1331980126905684%2C1966535236740763&exp=k0&rqm=GET

**Load Time**: 84.94 ms
**Pixel Code**: Show
**Pixel Location**: Hide

https://www.thezebra.com/insurance/homeowners/results?insuranceline=home

Applicant

ADVANCED MATCHING PARAMETERS SENT

**external_id**: Show

DATA PROCESSING PARAMETERS SENT

**dpo**:

Since Data Processing Options are sent, custom conversions or catalog feedback may not work. Learn more

EVENT INFO

**Setup Method**: Manual
**URL called**: Hide

https://www.facebook.com/tr/?id=776429362447999&ev=Applicant&dl=https%3A%2F%2Fwww.thezebra.com&rl=https%3A%2F%2Fwww.thezebra.com&if=false&ts=1744935534115&sw=1920&sh=1080&ud[external_id]=a257cd0123f9af66b50a6c5ea7c79044a72d0923319146323ef981ea9d8872fe&v=2.9.198&r=stable&ec=4&o=12316&fbp=fb.1.1744405902094.998662892472332572&pm=1&hrl=764cb9&cdl=API_unavailable&it=1744935531289&coo=false&dpo=&cs_cc=1&cas=9302455971008887%2C1173152686080623%2C6152055711506270%2C5941419452611371%2C6261736653851156%2C6261829983851329%2C4817185188310410%2C2967802623338403%2C3180764668602226%2C2816546648393602%2C4199291936751230%2C2768898739890096%2C2925331067528449%2C2481472778625932%2C2545184992237714%2C2303967759721311%2C2268355336573627%2C2203687509686117%2C2407302499290885%2C2674626765940889%2C1331980126905684%2C1966535236740763&exp=k0&rqm=GET

**Load Time**: 158.33 ms
**Pixel Location**: Hide

https://www.thezebra.com

80. By way of a second example, the following screenshot of the network traffic shows Defendant sending to Facebook the following transmission of a user searching for car insurance. In the URL of the request, red squares highlight that the individual user: (i) viewed a page on www.thezebra.com (denoted by the "ev=PageView") (ii) to compare care insurance quotes.

EVENT INFO

**Setup Method**: Manual

**URL called**: Hide

```
https://www.facebook.com/tr/?id=776429362447999&ev=PageVie
w&dl=https%3A%2F%2Fwww.thezebra.com&rl=https%3A%2F%2Fwww.t
hezebra.com&if=false&ts=1744937695940&sw=1920&sh=1080&ud[e
xternal_id]=a257cd0123f9af66b50a6c5ea7c79044a72d0923319146
323ef981ea9d8872fe&v=2.9.198&r=stable&ec=0&o=12316&fbp=fb.
1.1744405902094.998662892472332572&pm=1&hrl=42fb24&cdl=API
_unavailable&it=1744937695722&coo=false&dpo=&cs_cc=1&cas=9
302455971008887%2C11731526860806623%2C6231769476948078%2C565
564893454810 8%2C5947826041918873%2C5633096843432984%2C5541
743479244665%2C6046518985380348%2C6530759670284924%2C84458
1107549278 4%2C4951501038285512%2C5600388803380095%2C481718
518831041 0%2C2967802623338403%2C3180764668602226%2C2816546
648393602%2C4199291936751230%2C2768898739890096%2C29253310
67528449%2C2481472778625932%2C2620721371323376%2C251309439
8756730%2C2303967759721311%2C2268355336573627%2C2203687509
686117%2C2407302499290885%2C2674626765940889%2C1331980126 9
05684%2C1966535236740763&exp=k0&rqm=GET
```

**Load Time**: 33.90 ms

**Pixel Code**: Hide

```
<noscript><img height="1" width="1" style="display:none" s
rc="https://www.facebook.com/tr?id=776429362447999&amp;ev=
PageView&amp;noscript=1"></noscript>
```

**Pixel Location**: Hide

```
https://www.thezebra.com/insurance/car/results/
```

81. Further, in each of the disclosed network transmissions depicted above, Defendant discloses precisely who the individual user that used The Zebra Service on the Website is. Defendant uses "Advanced Matching," which "look[s] for recognizable form fields and other sources on your website that contain information such as first name, last name and email."[52] That information is recorded, "along with the event, or action, that took place."[53] This information is

[52] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

[53] *Id.*

"hashed,"[54] meaning it is "[a] computed summary of digital data that is a one-way process."[55] In other words, it "cannot be reversed back into the original data."[56]




82. Defendant discloses this information so it can better match users to their Facebook profiles, thereby allowing Defendant to better target its advertisements:

---

[54] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash.

[55] *Id.*

[56] *Id.*

> You can use Advanced Matching to help:
>
> - Increase the number of attributed conversions. We can match more of the conversions that happen on your website to people on Meta. This helps you understand the impact of your ads on website conversions.
> - Increase your Custom Audience size. We're able to better match your website visitors to people on Meta and increase the size of your Custom Audience.
> - Decrease the cost per conversion. Conversion-optimized campaigns become more efficient because we can better identify and deliver ads to the types of people likely to take the actions you care about.

83. The main identifier Facebook uses is an individual user's "c_user cookie," a unique identifier associated with a single Facebook user's Facebook profile ("Facebook ID" or "FID"). The cookie is a string of numbers that is unique to every Facebook account—distinguishing each FID from its peers.

| | |
|---|---|
| Cookie: | datr=9N4NZmTw46H6NwvRsSi0Yhg8; ps_n=1; sb=n5EaZ6b3XMUjYKs2riOQ7rAA; c_user=61553316465049; ar_debug=1; fr=1R6eUUYQJzPnOXCVI.AWf2AsAjvAfyQIVw42vXj9Tk7DPeHZgU0HiUfozB3AZoJzTzdfg.BoAZBe..AAA.0.0.BoAZBe.AWfbtON40uQCFdA0U0GeW2InTIs; xs=8%3AhnzOm1hg8evZhA%3A2%3A1744908752%3A-1%3A-1%3A%3AAcXUADAIraN_LgVuA1pu3K2NrYgI9IDP-hD_BQ6LqA |

84. Any person, even those without in-depth technical expertise, can utilize the FID to identify owners of the FID via their Facebook profile. Once the Pixel's routine exchange of information is complete, the FID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook FID to www.facebook.com (www.facebook.com/[FID]). That step, readily available through any internet browser, will direct the browser to the individual FID's profile page, including all the information contained in or associated with the profile page, for the user associated with the particular FID.

85. A user who accesses Defendant's Website while logged into Facebook will transmit the c_user cookie to Facebook, which contains that user's unencrypted Facebook ID. Notably, the FIDs are transmitted to Facebook in the same network transmission as each of events captured by the Pixel, meaning that Defendant simultaneously sends to Facebook a user's FID and the action tracked. Once sent, it is not difficult to put together that the individual who owns the FID applied for insurance on the Website.

86. Due to the integration of the Facebook Pixel on the Website, Facebook is able to intercept the information the Website user inputted for The Zebra Service. When Facebook intercepts this communication—made possible by Defendant's integration of the Facebook Pixel—Facebook effectively intercepts the user's protected personal information and PII.

87. When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies.

88. One such cookie is the "fr cookie" which contains, at least, an encrypted Facebook ID and browser identifier.[57] Facebook, at a minimum, uses the fr cookie to identify users. [58]




89. If a visitor has never created an account, an even smaller set of cookies are transmitted, but they are still transmitted nonetheless.

[57] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[58] *Cookies Policy*, META, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3 (last accessed Feb. 4, 2025).

90. At each stage, Defendant also utilizes the "_fbp cookie", which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user. [59]

91. The c_user cookie expires after 90 days of inactivity on Facebook if the user checked the "keep me logged in" checkbox on the website.[60]

92. The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[61] If that happens, the time resets, and another 90 days begins to accrue.[62]

93. The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[63] If that happens, the time resets, and another 90 days begins to accrue.[64]

94. The Facebook Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, the Website.[65] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[66] The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

95. Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles. Defendant sent these identifiers alongside the event data.

96. Moreover, Defendant transmits the foregoing personally identifiable information and contents of users' communications with the Website to Facebook so that Facebook can help

---

[59] *Id.*

[60] Seralthan, *Facebook Cookies Analysis*, MEDIUM (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.

[61] *See id.*

[62] Confirmable through developer tools.

[63] *See Cookies Policy*, META, https://www.facebook.com/policy/cookies/ (last accessed Feb. 4, 2025).

[64] Also confirmable through developer tools.

[65] *First-Party Cookies*, PC MAG, https://www.pcmag.com/encyclopedia/term/first-party-cookie (last accessed Feb. 4, 2025). This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[66] *Third-Party Cookies*, PC MAG, https://www.pcmag.com/encyclopedia/term/third-party-cookie (last accessed Feb. 4, 2025). This is also confirmable by tracking network activity.

Defendant launch marketing campaigns, target specific users with advertising, and analyze Website users' data.

97. According to Facebook, the Pixel "works by loading a small library of functions which [] can [be] use[d] whenever a site visitor takes an action (called an event) that [a client] want[s] to track (called a conversion)."[67] The Pixel "relies on Facebook cookies, which enable [Facebook] to match [] website visitors to their respective Facebook User accounts."[68] Facebook offers a menu of "standard events" that can be tracked, including what content a visitor views or purchases.[69] Advertisers can also create their own tracking parameters by building a "custom event."[70]

98. This gathered information is used for marketing and advertising. Specifically, the Pixel's library of functions can be used to "[t]rack conversions [] in the Ads Manager[,] … to define custom audiences for ad targeting, [and] for Advantage+ catalog ads campaigns[.]"[71]

99. Taking these one by one, "track[ing ] website visitors' actions[,] also known as conversion tracking[,] ... can be used to analyze the effectiveness of [a] conversion funnel and to

---

[67] *Meta Pixel*, META, https://developers.facebook.com/docs/meta-pixel (last accessed Feb. 4, 2025).

[68] *Meta Pixel: Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started (last accessed Feb. 4, 2025).

[69] *Specifications For Meta Pixel Standard Events*, META, https://www.facebook.com/business/help/402791146561655 (last accessed Feb. 4, 2025). *See also Meta Pixel: Standard Events*, META, https://developers.facebook.com/docs/meta-pixel/reference (last accessed Feb. 4, 2025).

[70] *About Standard And Custom Website Events*, META, https://www.facebook.com/business/help/964258670337005 (last accessed Feb. 4, 2025); *see also Marketing API: App Events API*, META, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last accessed Feb. 4, 2025).

[71] *Meta Pixel*, META, https://developers.facebook.com/docs/meta-pixel (last accessed Feb. 4, 2025).

calculate [] return[s] on ad investment[s]."[72] Once a client is "tracking conversions, [Facebook] recommend[s] that [the client] use them to … optimize [] ads for website conversions."[73]

100. A "custom audience is an ad targeting option"[74] that can be used by advertisers, like Defendant, "to find people most likely to respond to [their] ad[s]."[75] Clients can "[c]reate [an] online audience based on the traits of who [they] want to see [their] ad[s], and narrow down [their] ad[s'] audience[s] by interests, gender or location and use ad targeting to find the people most likely to take action. Once [an] ad starts running, [Facebook's] system will learn who is engaging with it and, over time, narrow [the] audience [to help] reach more of the right people."[76] Advertisers can target, *inter alia*, "[n]ew customers with specific interests or from a specific location"; "[p]eople who have already shown an interest in [a client's] business"; and "[p]eople who share interests with [a client's] current customers."[77]

101. "Advantage+ catalog ads are dynamically created by populating an ad template with product information found in a data feed. This allows [Facebook clients like Defendant] to create thousands of ads without having to configure each of them individually."[78] Clients "can also use Advantage+ catalog ads to target visitors based on how they have interacted with [their] website in the past."[79]

102. In short, Facebook states[80] that the Pixel can be used to:

---

[72] *Meta Pixel: Conversion Tracking*, META, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last accessed Feb. 4, 2025).

[73] *Id.*

[74] *About Custom Audiences*, META, https://www.facebook.com/business/help/744354708981227 (last accessed Feb. 4, 2025).

[75] *Audience Ad Targeting*, META, https://www.facebook.com/business/ads/ad-targeting (last accessed Feb. 4, 2025).

[76] *Id.*

[77] *Id.*

[78] *Meta Pixel for Advantage+ Catalog Ads*, META, https://developers.facebook.com/docs/meta-pixel/get-started/advantage-catalog-ads (last accessed Feb. 4, 2025).

[79] *Id.*

[80] *About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153 (last accessed Feb. 4, 2025).

- Make sure your ads are shown to the right people. Find new customers, or people who have visited a specific page or taken a desired action on your website.

- Drive more sales. Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.

- Measure the results of your ads. Better understand the impact of your ads by measuring what happens when people see them.

103. Gathered information is also used for analytics. Namely, the Pixel helps "understand[] the actions people take on [a] website."[81] "Examples of actions include adding an item to their shopping cart or making a purchase. The Pixel receives these actions, or events, which [] can [be] view[ed] on [the] Meta Pixel page in [the Facebook] Events Manager. From there, [a client will] be able to see the actions that [its] customers take."[82] This allows Facebook clients to "segment [their] website visitors into groups based on the actions they have taken on [their] website."[83] Additionally, with the Pixel, clients can "[a]dd events on the pages that matter to [their] business to help [] understand [] customers' journey[s]. If [one were to] set up events along their path (for example, from product page views to a purchase) it may help [] measure and optimize [] ads for the conversions that mean the most to [one's] business."[84]

104. Defendant uses the Pixel for such marketing, advertising, and analytics purposes. Defendant obtains revenue from the communications and interactions of users on the Website and therefore Defendant employs the Pixel to spy on users and intercept those communications. Defendant then gathers that information and catalogs it, creating an individualized profile of each user.

105. Defendant analyzes large masses of this user profile information to locate trends and adjust its digital content accordingly, as well as to serve "interest based ads" to users.

---

[81] *Id.*

[82] *Id.*

[83] *Custom Audiences*, META, https://developers.facebook.com/docs/meta-pixel/implementation/custom-audiences (last accessed Feb. 4, 2025).

[84] *About Standard And Custom Website Events*, Meta, https://www.facebook.com/business/help/964258670337005 (last accessed Feb. 4, 2025).

### B. Defendant Discloses Users' Personal Information and PII to Google

106. When a user inputs information on the Website, Defendant discloses to Google, through Google's services, the contents of the communication. For example, the following screenshot of the network traffic shows Defendant sending to Google the following transmission of a user searching for home insurance. In the URL of the request, red squares highlight that the individual users: (i) viewed a page on www.thezebra.com and (ii) searched for home insurance—as an owner—to compare quotes.


▾ Request Headers
:authority: analytics.google.com
:method: POST
:path: /g/collect?v=2&tid=G-2LLVMVSVKS&gtm=45je54g3v9100738832z871394146za200zb71394146&_p=1744929872649&gcd=13l3l3l3l1l1&npa=0&dma=0&tag_exp=102803279~102813109~102887800~102926062~103027016~103051953~103055465~103077950~103106314~103106316&cid=844173227.1744405902&ul=en-us&sr=1920x1080&uaa=x86&uab=64&uafvl=Google%2520Chrome%3B135.0.7049.95%7CNot-A.Brand%3B8.0.0.0%7CChromium%3B135.0.7049.95&uamb=0&uam=&uap=Windows&uapv=19.0.0&uaw=0&are=1&pae=1&frm=0&pscdl=noapi&_eu=AAAAAAI&_s=1&sid=1744929458&sct=5&seg=1&dl=https%3A%2F%2Fwww.thezebra.com%2Finsurance%2Fhome%2Fowner%2F%3Finsuranceline%3Dhome&dr=https%3A%2F%2Fwww.thezebra.com%2F&dt=Compare%20Home%20Insurance%20Rates%3A%20Fast%2C%20Free%2C%20Simple%20%7C%20The%20Zebra&en=page_view&tfd=2040


107. By way of a second example, the following screenshot of the network traffic shows Defendant sending to Google the following transmission of a user searching for car insurance. In the URL of the request, red squares highlight that the individual user: (i) viewed a page on www.thezebra.com (ii) to compare care insurance quotes.

▼ Request Headers

| | |
|---|---|
| :authority: | www.google-analytics.com |
| :method: | POST |
| :path: | /j/collect?v=1&_v=j101&a=135241030&t=pageview&cu=USD&_s=1&dl=https%3A%2F%2Fwww.thezebra.com%2Finsurance%2Fcar%2Fresults%2F&ul=en-us&de=UTF-8&dt=Compare%20Car%20Insurance%20Rates%3A%20Fast%2C%20Free%2C%20Simple%20%7C%20The%20Zebra&sd=24-bit&sr=1920x1080&vp=887x911&je=0&_u=SDCAAEALAAAAACAMI~&jid=12343508&gjid=388981887&cid=844173227.1744405902&tid=UA-29243804-1&_gid=613490983.1744929459&_r=1&gtm=45He54g3n71PXDK9Tv71394146za200&gcd=13l3l3l3l1l1&dma=0&tag_exp=101509157~102803279~102813109~102887800~102926062~103027016~103051953~103055465~103077950~103106314~103106316~103116026&cd3=(not%20set)&cd8=(not%20set)&cm1=0&il1nm=rate%20results&il1pi1ca=Root%20Insurance&il1pi1nm=AD&il1pi1ps=1&il1pi1pr=n%2Fa&il1pi2ca=Gainsco&il1pi2nm=AD&il1pi2ps=2&il1pi2pr=n%2Fa&il1pi3ca=Bristol%20West&il1pi3id=b6d6afd6b1bf4d568c220d7028cee3ba&il1pi3nm=QUOTE_TO_BIND&il1pi3ps=3&il1pi3pr=413.16&il1pi4ca=American%20Family&il1pi4nm=AD&il1pi4ps=4&il1pi4pr=n%2Fa&z=1194433042 |

108. Defendant also discloses other nonpublic information from a consumers' application, including whether they are currently insured and information related to their residence:

▾ Query String Parameters   View source   View URL-encoded

| | |
|---|---|
| v | 2 |
| tid | G-2LLVMVSVKS |
| gtm | 45je56n0h1v9100738832za200zb71394146 |
| _p | 1750798053517 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| tag_exp | 101509157~103116026~103200004~103233427~103351869~103351871~104528500~104573694~104684208~104684211~104718208 |
| cid | 1551699712.1749499979 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Google%20Chrome;137.0.7151.120\|Chromium;137.0.7151.120\|Not%2FA)Brand;24.0.0.0 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 15.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AEEAAAQ |
| _s | 4 |
| uid | b687f968-dcce-450b-bdc5-fe78c85463fc |
| sid | 1750796639 |
| sct | 5 |
| seg | 1 |
| dl | https://www.thezebra.com/ |
| dr | https://www.thezebra.com/insurance/car/results/ |
| dt | The Zebra: Instantly Compare Insurance Quotes |
| en | form_start |
| ep.form_id | |
| ep.form_name | |
| ep.form_destination | https://www.thezebra.com/ |
| epn.form_length | 6 |
| ep.first_field_id | 45625_driver_currently_insured |
| ep.first_field_name | driver_currently_insured |
| ep.first_field_type | checkbox |
| epn.first_field_position | 1 |
| _et | 90 |

▾ Query String Parameters View source View URL-encoded

<table>
<tr><td>v</td><td>2</td></tr>
<tr><td>tid</td><td>G-2LLVMVSVKS</td></tr>
<tr><td>gtm</td><td>45je56n0v9100738832za200zb71394146</td></tr>
<tr><td>_p</td><td>1750789050626</td></tr>
<tr><td>_gaz</td><td>1</td></tr>
<tr><td>gcd</td><td>13l3l3l3l1l1</td></tr>
<tr><td>npa</td><td>0</td></tr>
<tr><td>dma</td><td>0</td></tr>
<tr><td>tag_exp</td><td>101509157~103116026~103200004~103233427~103351869~103351871~104684208~104684211~104718208</td></tr>
<tr><td>cid</td><td>1551699712.1749499979</td></tr>
<tr><td>ul</td><td>en-us</td></tr>
<tr><td>sr</td><td>2560x1440</td></tr>
<tr><td>uaa</td><td>x86</td></tr>
<tr><td>uab</td><td>64</td></tr>
<tr><td>uafvl</td><td>Google%20Chrome;137.0.7151.120|Chromium;137.0.7151.120|Not%2FA)Brand;24.0.0.0</td></tr>
<tr><td>uamb</td><td>0</td></tr>
<tr><td>uam</td><td></td></tr>
<tr><td>uap</td><td>Windows</td></tr>
<tr><td>uapv</td><td>15.0.0</td></tr>
<tr><td>uaw</td><td>0</td></tr>
<tr><td>are</td><td>1</td></tr>
<tr><td>frm</td><td>0</td></tr>
<tr><td>pscdl</td><td>noapi</td></tr>
<tr><td>_eu</td><td>AEEAAAQ</td></tr>
<tr><td>_s</td><td>3</td></tr>
<tr><td>uid</td><td>b687f968-dcce-450b-bdc5-fe78c85463fc</td></tr>
<tr><td>sid</td><td>1750789023</td></tr>
<tr><td>sct</td><td>4</td></tr>
<tr><td>seg</td><td>1</td></tr>
<tr><td>dl</td><td>https://www.thezebra.com/insurance/home/start/</td></tr>
<tr><td>dr</td><td>https://www.thezebra.com/auto-insurance/</td></tr>
<tr><td>dt</td><td>Start | Compare home insurance rates | The Zebra</td></tr>
<tr><td>en</td><td>form_start</td></tr>
<tr><td>ep.form_id</td><td></td></tr>
<tr><td>ep.form_name</td><td>/home/start/</td></tr>
<tr><td>ep.form_destination</td><td>https://www.thezebra.com/insurance/home/start/</td></tr>
<tr><td>epn.form_length</td><td>11</td></tr>
<tr><td>ep.first_field_id</td><td>residence_type-CONDO</td></tr>
<tr><td>ep.first_field_name</td><td></td></tr>
<tr><td>ep.first_field_type</td><td>radio</td></tr>
<tr><td>epn.first_field_position</td><td>2</td></tr>
<tr><td>_et</td><td>28345</td></tr>
</table>

109. Thus, Defendant discloses to Google, through the Google advertising services, the exact contents of the communication as well as the PII of the individual user utilizing The Zebra Service.

110. Defendant further assisted Google by disclosing the PII of its applicants sufficient for Google to uncover their identities. In the HTTP communications shown above, the applicant's IP address is inherently included in every network request. In addition to its applicants' IP address, Defendant, through Google's tracking technology, disclosed information about their specific devices and User-IDs to Google, allowing Google to link such information to an individual's specific identity.

111. Defendant does so for marketing, advertising, and analytics purposes. Defendant obtains revenue from the communications and interactions of users on the Website and therefore Defendant employs Google's services to spy on users and intercept those communications.

Defendant then gathers that information and catalogs it, creating an individualized profile of each user.

112. Defendant analyzes large masses of this user profile information to locate trends and adjust its digital content accordingly, as well as to serve "interest based ads" to users.

## CLASS ALLEGATIONS

113. **Class Definition:** Plaintiff brings this action on behalf of himself and other similarly situated individuals defined as all persons in the United States who, during the class period, had their personally identifiable information or protected information disclosed to Facebook, Google, or other third-party entities, when applying for or comparing a quote for insurance on the Website (the "Class").

114. Plaintiff also brings this action on behalf of a subclass defined as all persons in the state of California who, during the class period, had their personally identifiable information or protected information disclosed to Facebook, Google, or other third-party entities, when applying for or comparing a quote for insurance on the Website (the "California Subclass").

115. Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

116. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

117. Excluded from the Classes is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

118. **Numerosity/Ascertainability.** Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are hundreds of

thousands of individuals in the Classes. The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Facebook and Google.

119. **Typicality.** Plaintiff's claims are typical of the claims of the Classes because Plaintiff used the Website and, as a result of Defendant's unlawful conduct, had his PII and private information intercepted by Facebook and Google without his express written authorization or knowledge. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

120. **Adequacy.** Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of data privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

121. **Common Questions of Law and Fact Predominate/Well Defined Community of Interest.** Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendant has acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

(a) Whether Defendant intentionally tapped the lines of internet communication between Website users and the Zebra Service;

(b) Whether the Website's webpages (including thezebra.com) contain code that permits third parties, such as Facebook and Google, to intercept users' personally identifiable information, protected information, and related communications;

(c) Whether Facebook is a third-party eavesdropper;

(d) Whether Google is a third-party eavesdropper;

(e) Whether Defendant knowingly transmitted users' personally identifiable information and library use records to the Third Parties;

(f) Whether Plaintiff's and Class Members' communications via the Website and the resultant interceptions thereof constitute an affirmative act of communication;

(g) Whether Defendant's conduct, which allowed the Third Parties—unauthorized persons—to view Plaintiff's and Class Members' personally identifiable information and their communications, resulted in a breach of confidentiality;

(h) Whether Defendant violated Plaintiff's and Class Members' privacy rights by using third-party technology, such as the Facebook Pixel and Google's tracking services, to allow third parties to intercept users' online communications along with information that uniquely identified the individuals;

(i) Whether Plaintiffs and Class Members are entitled to damages under the ECPA or any other relevant statute;

(j) Whether Plaintiffs and Class Members are entitled to damages under CIPA or any other relevant statute; and

(k) Whether Defendant's actions violate Plaintiff's and Members of the Class's privacy rights as provided by the California Constitution.

122. **Superiority.** Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## COUNT I
## Violation of the Electronic Communications Privacy Act
## 18 U.S.C. § 2511, *et seq.*

123. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

124. Plaintiff brings this claim on behalf of himself and members of the Class.

125. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

126. The ECPA protects both sending and the receipt of communications.

127. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

128. The transmission of Plaintiff's PII and financial information to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

129. The transmission of PII and financial information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

130. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

131. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

132. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

133. The following instruments constitute "devices" within the meaning of the ECPA:

a. The computer codes and programs Defendant, Facebook, and Google used to track Plaintiff and Class Members communications while they were navigating the Website;

b. Plaintiff's and Class Members' browsers;

c. Plaintiff's and Class Members' mobile devices;

d. Defendant's, Facebook's, and Google's web and ad servers;

e. The plan the Defendant, Facebook, and Google carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications

while they were using a web browser to navigate the Website.

134. Plaintiff and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

135. By utilizing and embedding the tracking technology provided by Facebook and Google on its website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

136. Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technology provided by Facebook and Google on its website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and financial information to Facebook and Google.

137. The Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII, including their identities and information related to the specific financial product they were applying for, as well as information related to their citizenship, housing status, and employment information. This confidential information is then monetized for targeted advertising purposes, among other things.

138. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to Facebook and Google through the Facebook Tracking Pixel and Google Analytics, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

139. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

140. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of

the Constitution or laws of the United States or of any state, namely, the GLBA, CalFIPA, and invasion of privacy, among others.

141. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendant violated a provision of the Gramm-Leach-Bliley Act, 16 C.F.R. § 313. This provision imposes a criminal penalty for knowingly disclosing "nonpublic personal information" to a third party. GLBA defines nonpublic personal information as:

> Any information that is not publicly available and that: a consumer provides a financial institution to obtain a financial product or service from the institution; results from a transaction between the consumer and the institution involving a financial product or service; or a financial institution otherwise obtains about a consumer in connection with providing a financial product or service.[85]

142. Plaintiff's information that Defendant disclosed to Facebook and Google qualifies as nonpublic personal information (including information related to their housing status and insurance coverage), and Defendant violated Plaintiff's and Class Members' expectations of privacy. Such conduct constitutes tortious and/or criminal conduct through a violation of 16 C.F.R. § 313. Defendant specifically used the tracking technology provided by Facebook and Google to track and utilize Plaintiff's and Class Members' PII for financial gain.

143. Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

144. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy. Plaintiff and Class Members, all of whom are users of the Website, had a reasonable expectation that Defendant would not redirect their communications to Facebook and Google without their knowledge or consent.

---

[85] 16 C.F.R. § 313

145. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

146. As a result of each and every violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2511, *et seq*. under 18 U.S.C. § 2520.

**COUNT II**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 631**

147. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the California Subclass.

148. The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code sections 630 to 638. CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications." Cal. Penal Code § 630.

149. A person violates California Penal Code section 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained.

Cal. Penal Code § 631(a).

150. Further, a person violates section 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

151. To avoid liability under section 631(a), a defendant must show it had the consent of all parties to a communication.

152. At all relevant times, Defendant aided, agreed with, and conspired with the Third Parties to track and intercept Plaintiff's and Class Members' internet communications while accessing the Website. These communications were intercepted without the authorization and consent of Plaintiff and Class Members.

153. Defendant, when aiding and assisting the wiretapping by the Third Parties, intended to help Facebook and Google learn protected information about Website users.

154. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Facebook Pixel and Google's tracking technology both fall under the broad catch-all category of "any other manner":

(a) The computer codes and programs that Facebook used to track Plaintiff's and Class Members' communications while they were navigating the Website;

(b) The computer codes and programs that Google used to track Plaintiff's and Class Members' communications while they were navigating the Website;

(c) Plaintiff's and Class Members' browsers;

(d) Plaintiff's and Class Members' computing and mobile devices;

(e) Facebook's web and ad servers;

(f) Google's web and ad servers;

(g) The web and ad-servers from which Facebook tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate the Website;

(h) The web and ad-servers from which Google tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate the Website;

(i) The computer codes and programs used by Facebook to effectuate its tracking and interception of the Plaintiff's and Class Members' communications while they were using a browser to visit Defendant's Website;

(j) The computer codes and programs used by Google to effectuate its tracking and interception of the Plaintiff's and Class Members' communications while they were using a browser to visit Defendant's Website; and

(k) The plan Facebook carried out to effectuate its tracking and interception of the Plaintiff's and Class Members' communications while they were using a web browser to visit Defendant's website.

(l) The plan Google carried out to effectuate its tracking and interception of the Plaintiff's and Class Members' communications while they were using a web browser to visit Defendant's website.

155. The personal information that Defendant permitted Facebook to intercept via the Website's integration of the Facebook Pixel, including users' communications for the comparison of insurance rates, constitutes protected information.

156. The personal information that Defendant permitted Google to intercept via the Website's integration of Google's tracking technology, including users' communications for the comparison of insurance rates, constitutes protected information.

157. As demonstrated above, Defendant violated the CIPA by aiding and permitting third parties to receive its users' online communications through the Website without their consent.

158. As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages. Additionally, Cal. Penal Code section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

159. Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

**COUNT III**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 632**

160. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

161. Plaintiff brings this Count individually and on behalf of the members of the California Subclass.

162. CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

163. The Third Parties' tracking technologies are "electronic amplifying or recording device[s]." *Id.*

164. At all relevant times, the communications between Plaintiff and Class Members on the one hand, and The Zebra on the other, were confidential.

165. At all relevant times, Facebook and Google intentionally used the tracking technology to eavesdrop upon and record such confidential communications.

166. When communicating with The Zebra, Plaintiff and Class Members had an objectively reasonable expectation of privacy, based on Cal. Civil Code § 53.5. Thus, Plaintiff and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities like Facebook and Google would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

167. Plaintiff and Class Members did not consent to any of the Third Parties' actions. Nor have Plaintiff or Class Members consented to the Third Parties' intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

168. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

**COUNT IV**
**Invasion of Privacy Under California's Constitution**

169. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

170. Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

171. At all relevant times, by using the Facebook Pixel to record and communicate users' FIDs alongside their protected communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution. In addition, at all relevant times, by using Google's Tracking Services to record and communicate users' Google accounts alongside their protected communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

172. Plaintiff and Class Members had a reasonable expectation that their communications and identity would remain confidential and that Defendant would not install wiretaps on the Website.

173. Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' protected communications alongside their personally identifiable information to third parties such as Facebook and Google.

174. This invasion of privacy is serious in nature, scope, and impact because it relates to users' protected communications requesting or obtaining insurance quotes and products. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

175. Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a. For a determination that this action is a proper class action;

b. For an order certifying the Classes, naming Plaintiff Penning as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

c. For an order declaring that Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

e. For an award of compensatory damages, including statutory damages where available, to Plaintiff and Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f. For punitive damages, as warranted, in an amount to be determined at trial;

g. For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

h. For prejudgment interest on all amounts awarded;

i. For injunctive relief as pleaded or as the Court may deem proper;

j. For an order awarding Plaintiff and Class Members their reasonable attorneys' fees and expenses and costs of suit; and

k. For an order granting Plaintiff and Class Members such further relief as the Court deems appropriate.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: July 1, 2025

**BURSOR & FISHER, P.A.**

By: /s/ *Philip L. Fraietta*
Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150

Facsimile: (212) 989-9163
E-mail: pfraietta@bursor.com

Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ehorne@bursor.com

*Attorneys for Plaintiff*