**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

STACY PENNING, individually and on behalf of all other persons similarly situated,

Plaintiff,

v.

INSURANCEZEBRA, INC., d/b/a THE ZEBRA,

Defendant.

Case No. 3:25-cv-03531-WHO

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE AND MOTION TO DISMISS**

Hearing Date: March 25, 2026
Time: 2:00 pm
Courtroom: 2 – 17th Floor
Judge: Hon. William H. Orrick

# TABLE OF CONTENTS


PAGE

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. DEFENDANT'S MOTION TO TRANSFER VENUE MUST BE DENIED BECAUSE DEFENDANT HAS NOT MET ITS BURDEN TO SHOW PENNING'S NOTICE OF OR UNAMBIGUOUS ASSENT TO THE WEBSITE'S TERMS ..... 2

A. Defendant Has Not Met Its Burden To Show Penning Was On Notice Of Defendant's Terms ..... 2

1. The Context Of The Transaction Would Not Put A Reasonable User On Notice ..... 2

2. The Design And Content Of The Insurance Funnel Have Multiple Indicia Of Inconspicuousness ..... 3

3. Defendant's Authorities Are Unpersuasive ..... 5

B. Defendant Has Not Met Its Burden To Show Penning Unambiguously Assented To Defendant's Terms ..... 5

II. PLAINTIFF HAS STANDING TO ASSERT HIS CLAIMS ..... 6

A. Defendant's Installation And Use Of The Pixels Facilitated The Profiling Of Penning And The Widespread Dissemination Of That Profile To Advertisers Without Consent ..... 7

B. Penning Plausibly Alleges The Capture of Private, Personal Information and its Dissemination to Third Parties ..... 9

III. DEFENDANT HAS NOT MET ITS BURDEN TO SHOW PLAINTIFF CONSENTED TO THE THIRD PARTIES' TRACKING ..... 10

IV. PLAINTIFF STATES A CLAIM FOR VIOLATION OF CIPA § 631 AND THE ECPA ..... 13

A. Meta And Google, As Employed By Defendant, Intercepted The Contents Of Plaintiff's Communications ..... 13

B. Meta And Google, As Employed By Defendant, Intercepted The Contents Of Plaintiffs' Communications In Transit ..... 14

C. Defendant Aided, Agreed With, Employed, Or Otherwise Procured The Third Parties' Wiretapping ..... 15

V. PLAINTIFF STATES A CLAIM FOR VIOLATION OF CIPA § 632 ..... 16

A. Plaintiff Alleges Defendant Recorded "Communications" ..... 16

B. Plaintiff's Communications Are "Confidential" ..... 17

C. California Has Enshrined Users' Right To Privacy In Their Insurance-Related And Financial Communications ........ 18

VI. PLAINTIFF ALLEGES A VIOLATION OF CIPA § 638.51 ........ 20

A. CIPA §§ 638.50-638.51 Apply To The Internet Based On The Plain Text Of The Statute ........ 20

B. Meta and Google Record "Routing, Signaling, Or Addressing" Information ........ 23

CONCLUSION ........ 24

# TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ........ passim

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) ........ 21

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) ........ 11

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) ........ 10

*Camplisson v. Adidas Am., Inc.*,
2025 WL 3228949 (S.D. Cal. Nov. 18, 2025) ........ 8, 22, 23

*Chabolla v. ClassPass Inc.*,
129 F.4th 1147 (9th Cir. 2025) ........ 5

*Cousin v. Sharp Healthcare*,
681 F. Supp. 3d 1117 (S.D. Cal. 2023) ........ 15

*Cruz v. Tapestry, Inc.*,
113 Cal. App. 5th 943 (2d Dist. 2025) ........ 2, 4

*Deivaprakash v. Conde Nast Digital*,
798 F. Supp. 3d 1100 (N.D. Cal. 2025) ........ 7, 8

*Deivaprakash v. Condé Nast Digital*,
2025 WL 2779193 (N.D. Cal. Sept. 30, 2025) ........ 7, 23

*Dept. of Justice v. Reporters Committee for Freedom of Press*,
489 U.S. 749 (1989) ........ 8

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) ........ 13

*Doe v. Talkiatry Management Servs., LLC*,
2025 WL 3190813 (C.D. Cal. Oct. 1, 2025) ........ 20, 22

*Doe v. Tenet Healthcare Corp.*,
789 F. Supp. 3d 814 (E.D. Cal. 2025) ........ 12

*Drummer v. Costar Grp., Inc.*,
2025 WL 3190656 (C.D. Cal. Oct. 22, 2025) ........ 21

*Edwards v. MUBI, Inc.*,
773 F. Supp. 3d 868 (N.D. Cal. 2025) .......... 5

*Frasco v. Flo Health, Inc.*,
349 F.R.D. 557 (N.D. Cal. 2025) .......... 8

*Fregosa v. Mashable, Inc.*,
2025 WL 2886399 (N.D. Cal. Oct. 9, 2025) .......... 20, 21, 22, 23

*Fregosa v. Mashable, Inc.*,
2026 WL 183857 (N.D. Cal. Jan. 23, 2026) .......... 20

*Gabrielli v. Haleon US Inc.*,
2025 WL 2494368 (N.D. Cal. Aug. 29, 2025) .......... 20

*Gabrielli v. Motorola Mobility LLC*,
2025 WL 1939957 (N.D. Cal. July 14, 2025) .......... 7, 22

*Garcia v. Build.com*, Inc.,
2023 WL 4535531 (S.D. Cal. July 13, 2023) .......... 9

*Gilligan v. Experian Data Corp.*,
2026 WL 32259 (N.D. Cal. Jan. 6, 2026) .......... 7, 11

*Godun v. JustAnswer LLC*,
135 F.4th 699 (9th Cir. 2025) .......... 5, 6

*Harris v. iHeartMedia, Inc.*,
2026 WL 247875 (N.D. Cal. Jan. 29, 2026) .......... 8

*Heerde v. Learfield Communications, LLC*,
741 F. Supp. 3d 849 (C.D. Cal. 2024) .......... 15

*In re Accellion, Inc. Data Breach Litig.*,
2025 WL 2799102 (N.D. Cal. Sept. 30, 2025) .......... 8

*In re Google Assistant Privacy Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) .......... 10

*In re Meta Pixel Tax Filing Cases*,
724 F. Supp. 3d 987 (N.D. Cal. 2024) .......... 13

*In re Meta Pixel Tax Filing Cases*,
793 F. Supp. 3d 1147 (N.D. Cal. 2025) .......... 20

*Jackson v. Amazon.com, Inc.*,
65 F.4th 1093 (9th Cir. 2023) .......... 2

*Jackson v. LinkedIn Corp.*,
744 F. Supp. 3d 986 (N.D. Cal. 2024) .......... 14

*James v. Walt Disney Co.*,
701 F. Supp. 3d 942 (N.D. Cal. 2023)........ passim

*Javier v. Assurance IQ, LLC*,
649 F. Supp. 3d 891 (N.D. Cal. 2023)........ 17

*Krzyzek v. OpenX Techs., Inc.*,
2026 WL 206855 (N.D. Cal. Jan. 27, 2026)........ 11

*Lee v. Plex, Inc.*,
773 F. Supp. 3d 755 (N.D. Cal. 2025)........ 6

*Lewis v. Magnite, Inc.*,
2025 WL 3687546 (C.D. Cal. Dec. 4, 2025)........ 23

*Marden v. LMND Med. Grp., Inc.*,
2024 WL 4448684 (N.D. Cal. July 3, 2024)........ 11

*McClung v. AddShopper, Inc.*,
2024 WL 189006 (N.D. Cal. Jan. 17, 2024)........ 9

*Mitchell v. Sonesta Int'l Hotels Corp.*,
2024 WL 4471772 (C.D. Cal. Oct. 4, 2024)........ 18

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023)........ 4, 5

*Ocasio v. United States*,
578 U.S. 282 (2016)........ 23

*People v. Hyatt*,
109 Cal. App. 5th 735 (4th Dist. 2025)........ 22

*Revitch v. New Moosejaw, LLC*,
2019 WL 5485330 (N.D. Cal. Oct. 23, 2019)........ 15

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. 2025)........ 11, 23

*Rocha v. Urb. Outfitters, Inc.*,
2024 WL 393486 (N.D. Cal. Feb. 1, 2024)........ 4

*Rodriguez v. Autotrader.com, Inc.*,
762 F. Supp. 3d 921 (C.D. Cal. 2025)........ 23

*Roney v. Miller*,
705 F. App'x 670 (9th Cir. 2017)........ 24

*Rose v. Variety Media, LLC*,
2025 WL 2794920 (Los Angeles Super. Ct. Sept. 24, 2025)........ 21

*Scarlett v. Future US, LLC*,
2025 WL 2614587 (San Francisco Super. Ct. Sept. 5, 2025) ... 21

*Schlueter-Beckner v. SimpliSafe, Inc.*,
2025 WL 2162948 (N.D. Cal. July 30, 2025) ... 5

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (4th Dist. 2021) ... 2, 3, 4

*Shah v. Cap. One Fin. Corp.*,
768 F. Supp. 3d 1033 (N.D. Cal. 2025) ... 11

*Shah v. Fandom, Inc.*,
754 F. Supp. 3d 924 (N.D. Cal. 2024) ... passim

*Shah v. MyFitnessPal, Inc.*,
2026 WL 216334 (N.D. Cal. Jan. 27, 2026) ... 21

*Smith v. LoanMe, Inc.*,
11 Cal. 5th 183 (2021) ... 23

*Smith v. Rack Room Shoes, Inc.*,
2025 WL 1085169 (N.D. Cal. Apr. 4, 2025) ... 13

*St. Aubin v. Carbon Health Techs., Inc.*,
2024 WL 4369675 (N.D. Cal. Oct. 1, 2024) ... 14, 15, 16

*Tate v. VITAS Healthcare Corp.*,
762 F. Supp. 3d 949 (E.D. Cal. 2025) ... 15, 16

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ... 7

*Tsering v. Meta Platforms, Inc.*,
2026 WL 89320 (N.D. Cal. Jan. 12, 2026) ... 24

*United States v. Gottesfeld*,
319 F. Supp. 3d 548 (D. Mass. 2018) ... 22

*United States v. Soybel*,
13 F.4th 584 (7th Cir. 2021) ... 22

*United States v. Ulbricht*,
858 F.3d 71 (2d Cir. 2017) ... 22

*Walsh v. Dollar Tree Stores, Inc.*,
2025 WL 2939229 (N.D. Cal. Oct. 16, 2025) ... 21

*Wright v. TrueCare Property Holdings, LLC*,
2025 WL 3248749 (S.D. Cal. Nov. 21, 2025) ... 24

*Xu v. Reuters News & Media, Inc.*,
2025 WL 3035016 (Santa Clara Super. Ct. Oct. 24, 2025) .......... 8, 20

*Yockey v. Salesforce, Inc.*,
745 F. Supp. 3d 945 (N.D. Cal. 2024) .......... 17

*Yoon v. Meta Platforms, Inc.*,
2024 WL 5264041 (N.D. Cal. Dec. 30, 2024) .......... 18

**STATUTES**

12 U.S.C. § 1843 .......... 12

18 U.S.C. § 2511(d) .......... 11

18 U.S.C. § 3127(3) .......... 22

Cal. Civ. Code § 53.5 .......... 18

Cal. Fin. Code § 4051 .......... 1

Cal. Fin. Code § 4052 .......... 12, 19

Cal. Ins. Code § 33 .......... 19

Cal. Ins. Code § 791 .......... 1, 18, 19

Cal. Pen. Code § 4 .......... 23

Cal. Pen. Code § 631 .......... 15, 16, 22

Cal. Pen. Code § 638 .......... passim

**REGULATIONS**

16 C.F.R. § 313 .......... 1

## INTRODUCTION

Congress and the California legislature recognize the importance of maintaining the privacy of consumers' sensitive personal and financial information when applying for insurance products and services. *See* 16 C.F.R. § 313; Cal. Fin. Code § 4051; Cal. Ins. Code §§ 791. Despite such duties to prevent consumers' private information from disclosure, Defendant unlawfully enables its consumers' personal and financial information to be captured and recorded by third parties when consumers access Defendant's website, www.thezebra.com (the "Website"). Such disclosures are not made for the benefit of consumers, but rather for the benefit of Defendant, as well as Meta and Google.

Despite this well-established history of privacy protections for financial information, Defendant argues that Plaintiff should not have expected his information to remain private because, as an insurance broker, Defendant shares Plaintiff's information in its normal course of business to provide insurance quotes. But to state the obvious, Meta and Google do not provide insurance. Instead, what Plaintiff brings claims over here is Meta and Google's collection of Plaintiff's personal and financial information—as enabled by Defendant—for advertising purposes and without knowledge or consent. This deprived users of the right to control—their financial and personal information. SAC ¶¶ 38-60, 105-115. Defendant's conduct here was also not an accident. Instead, Defendant deliberately employed the Third Parties to bolster its advertising revenue by allowing the Third Parties to harvest information, build comprehensive audiences, and enable advertisers like Defendant to better target users on social media platforms. *See id*. ¶¶ 64-104. This harm suffices for Article III standing—let alone the far less rigorous requirements for standing in state court—and that harm is only amplified by the privacy of the financial information at issue here. Defendant's remaining arguments about the merits of Plaintiff's privacy claims have been rejected time and time again.

For the following reasons, Defendant's Motions should be denied.

## ARGUMENT

### I. DEFENDANT'S MOTION TO TRANSFER VENUE MUST BE DENIED BECAUSE DEFENDANT HAS NOT MET ITS BURDEN TO SHOW PENNING'S NOTICE OF OR UNAMBIGUOUS ASSENT TO THE WEBSITE'S TERMS

Defendant argues that Penning is "bound by the included forum selection clause" because Penning's use of the "Website's auto insurance tool funnel leaves no doubt" that he "manifested his assent to" The Zebra's Terms of Service. MTT at 4. Not so. "An enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action … that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022). "Under California law and generally applicable principles of contract law, the burden is on [Defendant] as the party seeking arbitration to show that it provided notice of [the] TO[U] and that there was mutual assent to the contractual agreement to arbitrate." *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099 (9th Cir. 2023). Defendant has not met its burden.

#### A. Defendant Has Not Met Its Burden To Show Penning Was On Notice Of Defendant's Terms

##### *1. The Context Of The Transaction Would Not Put A Reasonable User On Notice*

As a preliminary matter, courts can determine whether a user is on inquiry notice "by considering the context of the transaction." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 480 (4th Dist. 2021). In *Sellers*, the Court of Appeal emphasized how a consumer

> is not asked to 'sign up' for an account but is instead invited to 'Start my trial' and get the answer to a single question for a one-time fee of $5. This is not a situation in which the registration process clearly contemplated some sort of continuing relationship that would require some terms and conditions, nor is there any evidence the Plaintiffs were familiar with the service being offered.

*Sellers*, 73 Cal. App. 5th at 480 (cleaned up). Here, as in *Sellers*, Penning was at best "attempting to '[s]tart [a] trial' to determine whether they wanted to use the [insurance] service at all and [was] not likely expecting that [his] 'trial' would be governed by … contractual terms." *Id*. Based solely on the context of Plaintiff's transaction with Defendant, therefore, Plaintiff was not on inquiry notice of Defendant's Terms of Service. *See also Cruz v. Tapestry, Inc.*, 113 Cal. App. 5th 943, 956 (2d Dist. 2025) ("An online purchase of merchandise does not necessarily give rise to a consumer expectation

of an ongoing relationship governed by extensive contractual terms.”).

### 2. *The Design And Content Of The Insurance Funnel Have Multiple Indicia Of Inconspicuousness*

Defendant’s insurance tool is presented in the form of a “funnel,” or “a form consisting of a series of pages with various questions on each page.” MTT at 2. The funnel as it “was presented to




Website visitors at the time of Penning’s visiting in January 2025” appears as follows: Del Rosario Declaration, (“Del Rosario Decl.”), Ex. D.

When determining the conspicuousness of text meant to put a consumer on notice, courts look at criteria such as “(1) the size of the text; (2) the color of the text as compared to the background it appears against; (3) the location of the text and, specifically, its proximity to any box or button the user must click to continue use of the website; (4) the obviousness of any associated hyperlink; and (5) whether other elements on the screen clutter or otherwise obscure the textual notice.” *Sellers*, 73 Cal. App. 5th at 473.

As to the first and fifth factors, the hyperlink is in “a tiny [] font considerably smaller than the font used in the surrounding website elements.” *Berman*, 30 F.4th at 856. In addition, “[t]he comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else.” *Id*. at 857. The font used to set forth the hyperlinks is smaller than any other written

element on the page. Del Rosario Decl. Ex. D. Specifically, there are multiple form fields with much larger text, including much larger checkboxes that users can click to enter information about their car insurance, and their home ownership status. *Id*. This leaves the hyperlink "sandwiched between other larger elements" "that [are] more likely to draw a consumer's attention." *Rocha v. Urb. Outfitters, Inc.*, 2024 WL 393486 at *5 (N.D. Cal. Feb. 1, 2024); *see also Berman*, 30 F.4th at 857 (finding no notice of hyperlink, even though it was above the action button, where "[t]he comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else" and "other visual elements draw the user's attention away" from the hyperlink). So, as the California Court of Appeal recently held:

> the notice text is approximately half the size of the text in the fields for information to be entered in the check-out page for delivery orders. Significantly, the labels for these fields appear in a graphic comprised of several boxes, and [Defendant] acknowledge[s] the transaction cannot be completed unless the consumer provides the information requested in those fields.
>
> Whereas [Defendant] ha[s] utilized a graphical interface to ensure a consumer supplies billing information, they have not done the same to alert a consumer to the Terms of Use (e.g., by requiring a consumer to check a box next to the notice text).

*Cruz*, 113 Cal. App. 5th at 959. As a result, when the page is taken as a whole, the hyperlinks are de-emphasized.

The third conspicuousness factor, the location of the notice text and its "proximity to any box or button the user must click to continue use of the website," does not weigh in Defendant's favor. *Sellers*, 73 Cal. App. 5th at 474. Defendant attempts to argue that "[t]he notice text" is "'conspicuously displayed directly above … the action button.'" MTT at 5 (quoting *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 516 (9th Cir. 2023)). Defendant is wrong. The hyperlinks appear at the very bottom of a page, buried under multiple headings, subheadings and checkboxes. The hyperlinks are also not directly above or below the "Save & continue" button that is meant to take users to the next page of the funnel. Del Rosario Decl. Ex. D. Instead, Defendant's Terms of Service and Privacy Policy are on the opposite side of the page from the "Save & continue" button. *Id.*

As Judge Breyer recently held, this placement renders the hyperlink inconspicuous because "the placement of [Defendant]'s disclosure was located off to the side—not directly above or below

the … button—and was displayed in relatively small text." *Schlueter-Beckner v. SimpliSafe, Inc.*, 2025 WL 2162948, at *4 (N.D. Cal. July 30, 2025). Other courts are in accord. *Godun v. JustAnswer LLC*, 135 F.4th 699, 712 (9th Cir. 2025) (hyperlink inconspicuous where advisal was not "located directly above or below the action button and is displayed in relatively small text"); *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1157 (9th Cir. 2025) ("A reasonably prudent user would likely click 'Continue' and read no further if she had no intention of using Facebook."); *Edwards v. MUBI, Inc.*, 773 F. Supp. 3d 868, 883 (N.D. Cal. 2025) (finding no notice where "clicking on the prominent 'GET STARTED' button at the top would automatically direct them to the page where they can start the trial").

*3. Defendant's Authorities Are Unpersuasive*

Defendant hangs its hat on *Oberstein* to support notice, claiming that "[c]omparison to the Ninth Circuit's favorable analysis of the 'sign-in wrap' agreement in Oberstein is instructive, as it closely mirrors The Zebra's Website design." MTT at 5. But *Oberstein* is distinguishable. The *Oberstein* court emphasized that "the notices were not buried on the bottom of the webpage or placed outside the action box but rather were located directly on top of or below each action button." *Oberstein*, 60 F.4th at 516-17. Here, in contrast, the hyperlinks are at the bottom of a user's screen after a multitude of larger text elements, and they are on the opposite side of the page from any "action box" (in this case, the "Save & continue" button). Del Rosario Decl. Ex. D.

**B. Defendant Has Not Met Its Burden To Show Penning Unambiguously Assented To Defendant's Terms**

Defendant also contends that Penning "unambiguously manifested his assent to those terms by clicking 'Save & continue.'" MTT at 6. "Manifestation of assent," Defendant argues, "will be found where the user is 'explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement.'" *Id*. at 6 (quoting *Godun*, 135 F.4th at 710). Despite this, Defendant never makes clear what act will constitute assent to its terms. As the Ninth Circuit has established, "[a] user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857. "Even strongly implicit advisement isn't enough—a webpage must explain that certain actions will be understood by the offeror to signal assent to

contractual terms. And it must identify what, exactly, those actions are." *Godun*, 135 F.4th at 711 (cleaned up).

The initial pages of Defendant's funnel do not meet this standard. The advisal states that "[b]y clicking 'Save & continue,' you consent to The Zebra saving the information you entered and sharing it with insurance carriers and other insurance professionals so you can get the most up-to-date quotes, no matter what device you're using." Del Rosario Decl. Ex. D. If the advisal stopped there, then Defendant might have a point: it is clear to the user that by clicking a button, they are consenting to send their information to insurance carriers. But then Defendant goes on to say, "Additionally, carriers and insurance professionals may use this to obtain information about your credit history." *Id*. At this point, a user's confusion begins. What, exactly, are carriers and insurance professionals using? Defendant says "this." *Id*. But it is not clear what "this" might be.

Defendant then follows up by claiming, "You also agree to The Zebra's Privacy Policy and Terms of Use." *Id*. But how, exactly? Do users agree by the mere act of using or browsing the site? Or do they agree by entering information? The original dependent clause—"by clicking 'Save & continue'"—can only modify the independent clause in front of it. This is because there is an entire sentence between that dependent clause and the sentence that discusses assenting to The Zebra's terms. Even the most descriptivist grammarian would have difficulty stretching the original dependent clause that far. "A website must use clear language to indicate what action will bind the user to the terms." *Lee v. Plex, Inc.*, 773 F. Supp. 3d 755, 767 (N.D. Cal. 2025). Because Defendant's grammar is not clear, users are not put on notice of what act constitutes assent to Defendant's terms. They are simply told that clicking "Save & continue" means they agree to send their information to insurance carriers, nothing more. *Godun*, 135 F.4th at 712 ("The advisal lacked an explanatory phrase indicating that "By clicking connect now" … she agreed to the terms."); *Berman*, 30 F.4th at 858 ("Both webpages stated, 'I understand and agree to the Terms & Conditions,' but they did not indicate to the user what action would constitute assent to those terms and conditions.").

## II. PLAINTIFF HAS STANDING TO ASSERT HIS CLAIMS

Defendant argues that because "[P]laintiff does not claim a tangible (i.e., physical or monetary) harm, he must identify an 'intangible' harm that has a 'close relationship to harms

traditionally recognized as providing a basis for a lawsuit in American courts.'" MTD at 6. (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021)). Plaintiff has done so.

**A. Defendant's Installation And Use Of The Pixels Facilitated The Profiling Of Penning And The Widespread Dissemination Of That Profile To Advertisers Without Consent**

Defendant argues that Plaintiff's "bare statutory violation" of CIPA involves only the "supposed 'addressing' information, such as Penning's "Facebook ID, Google ID, hashed e-mail, and browser fingerprints" and that "[n]one of these categories is sufficient to confer standing." MTD at 7. This takes a myopic view of Plaintiff's allegations, which are more than sufficient to establish standing. To put it succinctly, the harm Plaintiff alleges here is that, through the personally identifiable insurance-related and financial communications that Defendant allows Third Parties to collect, website users are identified by being linked to comprehensive, non-anonymous profiles and that those profiles are offered up for sale to advertisers. *See, e.g.*, SAC ¶¶ 34, 46, 63-64, 108-111, 174-175 ("Defendant and the Third Parties used the Third Parties' pixels to identify Plaintiff and California Subclass Members by matching them to profiles held by the Third Parties, and to facilitate targeting advertising on Meta's website and on websites employing Google's ad-serving technology.")

"Accordingly, it does not matter whether [Plaintiff] had a reasonable expectation of privacy in the information collected because the privacy violation extends beyond the collection of just his IP address and metadata; it encompasses how that collection allegedly allowed the third parties to: (1) build a profile reflecting his personal information; and (2) interfere with his ability to remain anonymous." *Deivaprakash v. Conde Nast Digital*, 798 F. Supp. 3d 1100, 1107 (N.D. Cal. 2025); *see also*, *e.g.*, *Deivaprakash v. Condé Nast Digital*, 2025 WL 2779193, at *2 (N.D. Cal. Sept. 30, 2025) ("Deivaprakash alleges that internet trackers allowed third parties to generate profiles reflecting his personal information. That privacy injury finds historical analogues in injuries redressable under the common law."); *Gilligan v. Experian Data Corp.*, 2026 WL 32259, at *2 (N.D. Cal. Jan. 6, 2026) (Article III standing where plaintiffs "alleged that they were subject to these profile-building practices"); *Gabrielli v. Motorola Mobility LLC*, 2025 WL 1939957, at *6 (N.D. Cal. July 14, 2025) ("Gabrielli's allegations that Motorola deprived him control of personal

information regarding his digital activity and profile are sufficient to establish a concrete injury to his right to privacy and confer standing."); *Camplisson v. Adidas Am., Inc.*, --- F. Supp. 3d ---, 2025 WL 3228949, at *6 (S.D. Cal. Nov. 18, 2025) ("Plaintiffs have alleged that the Trackers on Defendant's website have collected a broad set of their personal identifying … without their consent … This claim maintains a violation of privacy, particularly in the control of their own information."); *Harris v. iHeartMedia, Inc.*, 2026 WL 247875, at *2 (N.D. Cal. Jan. 29, 2026) ("The Court finds that Plaintiff has alleged the violation of a privacy interest that bears a 'close relationship' to traditional harms – *i.e.*, the loss of the ability to control information about himself and to avoid the broad dissemination of that information.").

In this way, Penning and others lost their right to "control [] information concerning his or her person," which is encompassed within "both the common law and the literal understandings of privacy." *Dept. of Justice v. Reporters Committee for Freedom of Press*, 489 U.S. 749, 763 (1989). This is at least analogous to the tort of intrusion upon seclusion, although an exact match is not required by Ninth Circuit jurisprudence. *Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 580 (N.D. Cal. 2025) ("[T]he harm made actionable at common law was an individual's loss of control over her private affairs or concerns by an interloper's tortious intentional interference.") (cleaned up); *In re Accellion, Inc. Data Breach Litig.*, 2025 WL 2799102, at *13 (N.D. Cal. Sept. 30, 2025) ("[T]he Court concludes the better reading of *TransUnion* is that harms need only be similar in kind to those redressed by common law torts. That is because *TransUnion* expressly rejected the notion that an 'exact duplicate' is required….").

Moreover, Penning's harm is traceable to Defendant's conduct. Defendant is alleged to have "enabled the third parties to amass information about [Penning] by embedding the code in its website[] that surreptitiously installed the trackers on [Penning's] browser in the first place." *Deivaprakash*, 798 F. Supp. 3d at 1107; *Xu v. Reuters News & Media, Inc.*, 2025 WL 3035016, at *3 (Santa Clara Super. Ct. Oct. 24, 2025) ("[I]t appears Defendant does not account for Plaintiff's allegation that it was responsible for the installation of the Trackers."); *see*, *e.g.*, SAC ¶¶ 35, 46, 63, 65-104. Indeed, the Third Parties' tracking was not only done at Defendant's direction, but for Defendant's financial benefit as well (*i.e.*, advertising revenue). *See*, *e.g.*, SAC ¶¶ 34, 64, 115. And

the harm that befell Penning here—the linkage to non-anonymous profiles and the continued building of the same—occurred directly on Defendant's Website. *See*, *e.g.*, *id.* ¶¶ 34-35, 46, 50, 62, 75, 85, 101. Defendant's "knowing participation in this scheme … is enough to confer standing for a victim of the scheme to sue [Defendant] in federal court." *McClung v. AddShopper, Inc.*, 2024 WL 189006, at *2 (N.D. Cal. Jan. 17, 2024); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 931 (N.D. Cal. 2024) ("Even if third parties developed and used the Tracker software, it is alleged that Fandom was responsible for integrating the third-party script into its own website.") (cleaned up)

### B. Penning Plausibly Alleges The Capture of Private, Personal Information and its Dissemination to Third Parties

Defendant argues that Plaintiff "alleges too little about his personal experience, and even the alleged hypothetical data captures are insufficient." MTD at 9. Specifically, Defendant claims that Plaintiff must identify the "specific personal information [he] disclosed that implicates a protectable privacy interest," and that the SAC at best speculates as to what Facebook and Google "theoretically" can do, without credibly alleging anything that is "reflective of Penning's experience." *Id.* at 5, 9. Defendant is incorrect on multiple fronts.

*First*, contrary to Defendant's claims, Plaintiff's allegations about his experience on the Website are more than sufficient. *See* SAC ¶ 108 (describing list of information submitted by Plaintiff). Plaintiff further alleges that when he "communicated with the Website, as described above, the Third Parties—as employed by Defendant—collected the contents of Plaintiff Penning's communications, including but not limited to the type of insurance (car insurance) and what actions (comparing quotes) Plaintiff Penning was requesting." *Id.* ¶ 109. When Plaintiff alleges the information users must submit when looking for an insurance quote (*id.* ¶¶ 31, 108), the plausible inference is that Plaintiff himself provided this information when he conducted those activities. *See James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 949 n.2 (N.D. Cal. 2023) ("The Court acknowledges that the complaint does not expressly tie the allegations … to Plaintiffs specifically. However … it can reasonably be inferred that the list of information that BlueKai collects applies to Plaintiffs."); *see also Garcia v. Build.com*, Inc., 2023 WL 4535531, at *3 (S.D. Cal. July 13, 2023) (finding "Plaintiff has standing at this stage" and rejecting argument that "Plaintiff never asserts that she

shared 'highly sensitive personal data' with Defendant through the chat feature") (emphasis in original).

*Second*, construing these allegations in Plaintiff's favor, as the Court must at this stage, Plaintiff plausibly alleges he communicated sensitive financial and personal information that was unlawfully intercepted by Meta and Facebook—as enabled by Defendant. In addition, nothing requires Plaintiff to allege his *exact* private financial communications in a public filing. *James*, 701 F. Supp. 3d at 956 ("[T]o the extent Disney suggests Plaintiffs must plead the exact communications they had with the ESPN.com website, other courts have rejected that position."); *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 816 (N.D. Cal. 2020) ("[T]he Court rejects Defendants' suggestion that Plaintiffs must identify specific communications that Plaintiffs reasonably believed to be private and that were wrongly recorded. The Court is not convinced that Plaintiffs are required to produce such details at the pleading stage, prior to discovery.").

Defendant concludes by claiming "Penning lacks a traditional privacy harm associated with these other purported statutory violations. There is only a cognizable privacy interest in consumer data that is sufficiently sensitive and confidential." MTD at 10. But Plaintiff's consumer data *is* sufficiently sensitive. It is so sensitive, in fact, that California's Legislature codified the right to privacy in this type of financial information in the California Insurance Information And Privacy Protection Act, and the California Financial Information Privacy Act. Thus, the California Legislature sought to protect the human interest in keeping communications about financial information confidential. *See* SAC ¶ 20; *see also* Argument § II.A, *supra*.

**III. DEFENDANT HAS NOT MET ITS BURDEN TO SHOW PLAINTIFF CONSENTED TO THE THIRD PARTIES' TRACKING**

"[C]onsent is an affirmative defense for which [D]efendant bears the burden of proof." *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024) (cleaned up). Defendant has not its burden here. Defendant first claims that "[u]sers are put on notice of and necessarily consent to the Website's use of Meta and Google tools." MTD at 11. That argument fails for the reasons set forth above. Argument §§ I.A-I.B, *supra*.

Defendant then argues that "[r]egardless of Penning's consent, [Plaintiff's] ECPA claim also

fails because it is a single-party consent statute." MTD at 12. It is true that there can be no violation of ECPA if "one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(d). An exception to this exception exists, however, where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." *Id.*

To wit, courts have routinely found this "crime-tort" exception applies where plaintiffs "alleged that [technology companies] intercepted their communications for the purpose of associating their data with preexisting user profiles," that this "association of their data with preexisting user profiles violated state law" (*Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021)), and that the technology companies "benefited from this interception by using the information to sell ads to other third-party advertisers." *Marden v. LMND Med. Grp., Inc.*, 2024 WL 4448684, at *3 (N.D. Cal. July 3, 2024); *Shah v. Cap. One Fin. Corp.*, 768 F. Supp. 3d 1033, 1053 (N.D. Cal. 2025) (Plaintiffs also allege that Defendant intercepted the contents of the electronic communications for an unauthorized purpose, which resulted in tortious acts. Because Defendant's actions are allegedly tortious, the one-party exemption does not apply.").

Defendant claims that its use of "Facebook and Google tools 'to facilitate marketing and targeted advertising,'" are "motivations" that "cannot form the basis of a criminal or tortious purpose." MTD at 12 (quoting SAC ¶¶ 3, 64). Courts in this District disagree:

> [T]his Court is not persuaded that commercially exploiting unlawfully obtained information is 'licit' merely because it is profitable.
>
> …
>
> The existence of an underlying financial motivation does not mean that the act lacked a criminal or a tortious purpose. That's like saying that a bank robber's purpose was not to commit a crime—it was to make money.

*Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1090-91 (N.D. Cal. 2025) (denying to "adopt any bright-line rule insulating financial motives from the crime-tort exception") (cleaned up); *see also Krzyzek v. OpenX Techs., Inc.*, --- F. Supp. 3d ---, 2026 WL 206855, at *8 (N.D. Cal. Jan. 27, 2026) ("The Court is not persuaded by the authorities OpenX's cites to argue financial motives cannot constitute tortious motive."); *Gilligan*, 2026 WL 32259, at *3 ("[B]eing primarily motivated

to make money does not preclude application of the crime-tort exception, which is adequately alleged to apply here."); *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 850 (E.D. Cal. 2025) ("financial[] motivate[ions] … do not immunize Defendants from liability under the ECPA").

Here, Plaintiff alleges Defendant intercepted his communications for the purpose of "monetize[ing]" user information to add to "comprehensive user profiles," and for facilitating targeted advertising. SAC ¶¶ 3, 32, 34, 46 148. Thus, regardless of whether website operators consented to Defendant's behavior, the crime-tort exception applies. And because Plaintiff and Class Members did not consent (*id*. ¶¶ 3, 39, 112, 115, 139, 147), Defendant remains liable.

Defendant then argues that it is not a covered "financial institution" under the GLBA and its "California corollary CalFIPA." MTD at 13:6-7. This is wrong. Cal. Fin. Code § 4052(c) defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 of the United States Code and doing business in [California]." 12 U.S.C. § 1843 defines financial activities as: "[l]ending, exchanging, transferring, investing for others, or safeguarding money or securities [… or] [p]roviding financial, investment, or economic advisory services." Defendant touts itself as an "award-winning, legitimate, licensed insurance broker" that has a team of over 100+ "Texas, USA-based agents (licensed in all 50 states)" that are able to help customers "find a policy."[1] In its capacity as an insurance broker, it is providing the "financial" or "economic advisory services" that qualify as financial activities under 12 U.S.C. § 1843. Defendant's argument that Plaintiff's "use of the Website stopped far short of using The Zebra as an agent or broker for any insurance policy" (MTD at 13) is thus unavailing. The question is not whether Defendant was acting as an insurance broker specifically on Plaintiff's behalf, but whether Defendant is a financial institution *in general*. It is, and therefore Plaintiff plausibly alleges a violation under the GLBA.

[1] *Is The Zebra Legit?*, https://www.thezebra.com/about/is-the-zebra-insurance-legitimate/ (last accessed Jan. 28, 2026).

## IV. PLAINTIFF STATES A CLAIM FOR VIOLATION OF CIPA § 631 AND THE ECPA

### A. Meta And Google, As Employed By Defendant, Intercepted The Contents Of Plaintiff's Communications

Defendant claims that Plaintiff "does not allege that the Facebook or Google tools were configured to capture the users' form submissions, only a record that they had used one of the tools." MTD 14. This characterization does not capture the extent of the information that Defendant allows Meta and Google to intercept. Plaintiff alleges Defendant enabled Meta and Google to intercept personal information of The Zebra users, "including whether they are currently insured and information related to their residence (e.g., the type of home a person has)" and whether they "searched for home insurance—as an owner—to compare quotes." SAC ¶¶ 41-45. For instance, the SAC includes illustrative screenshots showing that a Google user looked for auto insurance as a driver that is currently insured and that a Google user searched for home insurance for a condo. *Id.* The granularity of this captured information is not simply a "record that [someone] had used one of [Defendant's] tools." MTD 14.

Plaintiff's and Class Members' affirmative actions with the The Zebra funnel—that is, searching for quotes and entering information about their homeownership or insurance status—and what those specific descriptors are, qualify as the "contents" of communications because they constitute "the substance of the message itself." *James*, 701 F. Supp. 3d at 956 (finding contents were intercepted where "Plaintiffs have alleged that Oracle intercepted, e.g., information about the webpages they viewed and searches they conducted"); *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1076 (N.D. Cal. 2023) (Orrick, J.) ("[T]he log-in buttons and the kinds of descriptive URLs … are 'contents' within the meaning of the statute.") (cleaned up); *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1004 (N.D. Cal. 2024) (finding "contents" were intercepted where "[t]he financial information that was transmitted to Meta from the tax filing websites included form field information and/or information affirmatively provided by the website user to the website"); *Smith v. Rack Room Shoes, Inc.*, 2025 WL 1085169, at *4 (N.D. Cal. Apr. 4, 2025) (contents alleged where plaintiffs alleged "Attentive collected readable versions of their personal identifying information—

names, addresses, and telephone numbers—generated when they entered that information into a website form").

**B. Meta And Google, As Employed By Defendant, Intercepted The Contents Of Plaintiffs' Communications In Transit**

Defendant argues that Plaintiff only "summarily alleges that Facebook 'simultaneously' receives users' communications and collects the contents of such communications," that Plaintiff's allegations "suggest that any reading or learning (Google's analysis of the data) occurs after the data is intercepted and logged 'in real time,'" and that "the mere act of *processing* the data … does not constitute "reading or learning the content of any communications." MTD at 17. This is wrong.

Plaintiff alleges the information Meta and Google intercept is "read and used [] for its own marketing services." *Jackson v. LinkedIn Corp.*, 744 F. Supp. 3d 986, 994 (N.D. Cal. 2024); *see also* SAC ¶ 42 ("the following screenshot of the network traffic shows Meta reading or learning the following information of a user (like Plaintiff) searching for car insurance as the user is conducting the search"). This shows that Google and Meta are attempting to "understand" the meaning and purport of Plaintiffs' communications, or else they would not be able to effectively target advertising on Google and Facebook platforms.

As to whether that reading happens "in transit," Plaintiff alleges that Meta acquires their communications contemporaneously or simultaneously with their actions on The Zebra funnel. SAC ¶ 40; *see also St. Aubin v. Carbon Health Techs., Inc.*, 2024 WL 4369675, at *6 (N.D. Cal. Oct. 1, 2024) (finding process by which Meta acquires communications via the Facebook Pixel constitute "in transit" interception); *James*, 701 F. Supp. 3d at 962 ("in transit" interception alleged where "once BlueKai is on the device, it then begins to intercept communications when the user makes communications to the website") (cleaned up). And Defendant enables Google and Meta's interception of communications so they can use the information gained to facilitate, among other things, targeted advertising. *See* SAC ¶¶ 3, 34, 64, 85, 103. This interception, collection, and processing happen in real-time—which is how Meta and Google can provide businesses with real-time data monitoring that provides insights into how targeted ads are doing. SAC ¶¶ 73, 93. Google and Meta are not collecting and intercepting data and setting it aside for it to be read at a later time.

To that end, courts have routinely held that Meta reads communications "in transit" at the pleadings stage. *See, e.g., Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1131 (S.D. Cal. 2023) ("Plaintiffs plead that communications were intercepted in transit sufficient to survive dismissal under Rule 12(b)(6). Defendant's arguments regarding what constitutes 'in transit' are best left for resolution at the summary judgment stage."); *St. Aubin*, 2024 WL 4369675, at *6 (finding plaintiff has plausibly alleged interception in transit with respect to the Facebook Pixel where the Pixel "script surreptitiously directs the user's browser to contemporaneously send a separate message to Facebook's servers") (cleaned up); *Heerde v. Learfield Communications, LLC*, 741 F. Supp. 3d 849, 862 (C.D. Cal. 2024) ("in transit" interception alleged where "Plaintiffs allege that, after they entered their Search Terms, the Search Terms were replicated and sent in parallel to the tracking entities").

### C. Defendant Aided, Agreed With, Employed, Or Otherwise Procured The Third Parties' Wiretapping

Defendant also claims that the language of CIPA requires "that The Zebra had both knowledge of [Meta and Facebook's] conduct, and a purpose of aiding, agreeing with, or employing them to commit the acts," and that Plaintiff "fails to allege The Zebra's 'requisite knowledge and intent.'" MTD at 18. Defendant misreads CIPA and imposes a higher intent standard.

The text of the fourth clause of CIPA § 631(a) provides for liability when a person "aids, agrees with, employs, or conspires with any person" to violate the statute. Cal. Pen. Code § 631(a). The legislature's use of the terms "aids," "agrees with," and "employs" indicates CIPA § 631(a) was meant to apply to a broad swath of non-criminal conduct. *See Cousin*, 681 F. Supp. 3d 1117, 1129-30 (S.D. Cal. 2023); *see also Tate v. VITAS Healthcare Corp.*, 762 F. Supp. 3d 949, 959 (E.D. Cal. 2025); *St. Aubin*, 2024 WL 4369675, at *8. Thus, "aid" should be interpreted as "to give assistance,"[2] "agrees with" as "to concur in opinion or purpose,"[3] and "employs" as "to make use of" or "to hire."[4] In short, a defendant violates the fourth clause of CIPA § 631(a) where it simply "enables" another's wrongdoing. *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019)

---

[2] AID, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/aid.

[3] AGREE, BLACK'S LAW DICTIONARY (11th ed. 2019).

[4] EMPLOY, BLACK'S LAW DICTIONARY (11th ed. 2019).

("[T]he complaint adequately alleges that Moosejaw violated section 631 by enabling NaviStone's wrongdoing.").

Applying the plain textual standard, Plaintiff has met his burden. Specifically, Defendant is alleged to have integrated Google and Meta's tracking pixels onto Defendant's website (SAC ¶¶ 34-35, 46, 63-64), Defendant is alleged to have configured the Meta pixel's ability to collect certain information, and collaborated with Google to advertise its business after enabling Google to collect user information. *Id.* ¶ 66, 78, 84, 97. And Plaintiff alleges all of this is done without his consent. *Id*. ¶¶ 2, 39, 112, 115, 139. To put it simply, Meta and Google's pixels did not appear on Defendant's Website by accident. Instead, Defendant made the deliberate choice to work with, integrate, and enable Meta and Google to collect sensitive financial and personal information. Such allegations are sufficient under any standard, let alone the one the plain text requires. *See*, *e.g.*, *James*, 701 F. Supp. 3d at 954 (requisite intent alleged where "it can reasonably be inferred that Disney entered into a contractual arrangement with Oracle under which Oracle would collect information from EPSN.com website users so that Disney could market to and attract new customers"); *St. Aubin*, 2024 WL 4369675, at *8 (same where "Carbon Health chose to include Facebook Pixel on its [] Website" and "[t]he Facebook Pixel code enables Facebook to help Carbon Health with advertising to its own patients outside the [] Website"); *Tate*, 762 F. Supp. 3d at 959 ("Plaintiff's claims that VITAS has supported Invoca … by allowing Invoca access to the calls and has presumably paid Invoca to analyze the data those calls yield are sufficient to implicate section 631(a).").

## V. PLAINTIFF STATES A CLAIM FOR VIOLATION OF CIPA § 632

### A. Plaintiff Alleges Defendant Recorded "Communications"

Defendant re-argues that "Plaintiff has not alleged that the substance of his responses to questions in the auto funnel were captured; instead, he has only alleged the supposed capture of minimal, use-oriented 'page view' and 'form_start' events." MTD at 20. This characterization ignores the specificity of Plaintiff's allegations and contradicts the network traffic depicted in the SAC that shows the capture of personal details about users of Defendant's funnel tool. *See* SAC ¶ 109 ("the Third Parties—as employed by Defendant—collected the contents of Plaintiff Penning's communications, including but not limited to the type of insurance (car insurance) and what actions

(comparing quotes) Plaintiff Penning was requesting"); *see also* SAC ¶ 45 (screenshots of network traffic showing that a Google user has entered information revealing that he is a currently insured driver, or that a Google user has entered information revealing that he owns a condo and is looking for an appropriate policy).

Defendant attempts to buttress its argument by saying that, at best, it captures "sanitized URLs and uncertain system field names that reflect only the type of insurance" being searched for. MTD at 20. But even these allegedly "sanitized" URLs are nonetheless revelatory of users' insurance needs in a way that would aid targeted advertising. For example, they filter users into "homeowner" categories or reveal that a user is a "car owner." Either piece of information would allow advertisers and other third parties to better calibrate their ads to The Zebra users' demographics.

**B. Plaintiff's Communications Are "Confidential"**

As a last gasp, Defendant avers that their transmissions to Third Parties are lawful because "Website users could not have expected that communications with The Zebra would be confined to just The Zebra. The Website's purpose—indeed the purpose Plaintiff had when he came to 'search for, obtain, and compared price quotes from multiple insurance providers' (SAC ¶105)— is that The Zebra shares a user's information with other parties to gather and compare insurance quotes." MTD 20. This is a red herring. Whether Plaintiff expected his communications to be shared with Defendant and *insurance companies* is far different than whether Plaintiff expected those communications to be intercepted by completely unrelated social media or advertising companies without any notice or consent (he did not). Courts are not sympathetic to the latter. *See, e.g.*, *Yockey v. Salesforce, Inc.*, 745 F. Supp. 3d 945, 957 (N.D. Cal. 2024) ("[W]hile Plaintiffs may have been aware that the party receiving the message … w[as] receiving the communications … they had not consented to an undisclosed third party intercepting the message.") (internal quotations omitted); *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 896 (N.D. Cal. 2023) ("[W]hile [plaintiff] may have impliedly consented to Assurance's [the website's] collection of his information, he did not impliedly consent to *ActiveProspect* [the third party] doing so") (emphasis in original); *Fandom*, 754 F. Supp. 3d at 932 ("A user who consents to disclose their IP address to Fandom as part of accessing

its website does not necessarily consent to disclose their IP address to the third parties operating the Trackers.").

Thus, whether Plaintiff was aware Defendant would shop his insurance information around to well-regulated insurance companies does not mean he also gave Defendant blanket permission to share his data with Google and Meta.

**C. California Has Enshrined Users' Right To Privacy In Their Insurance-Related And Financial Communications**

Defendant claims that Plaintiff's "supposedly captured information is both too limited and too uncertain to warrant protection. And the intended nature of the comparison tools—that The Zebra affirmatively share users' information to generate quotes—overcomes any expectation the communication would be strictly held between the user and The Zebra, as required for § 632." MTD at 21-22. Not so.

Courts have widely recognized that this type of financial information is entitled to heightened privacy protections. *See* Argument § I.B, *supra.* And courts have deemed online communications "confidential" when they contain information that is protected by a federal or state statute. *See*, *e.g.*, *Yoon v. Meta Platforms, Inc.*, 2024 WL 5264041, at *7 (N.D. Cal. Dec. 30, 2024) (finding "collected data" was "confidential because it allegedly reveals the exact title of the video being watched," which is protected by the federal Video Privacy Protection Act); *Mitchell v. Sonesta Int'l Hotels Corp.*, 2024 WL 4471772, at *1, *11 (C.D. Cal. Oct. 4, 2024) (finding "Plaintiff's interactions with a website … in the course of browsing and booking a hotel" were "'confidential' (irrespective of whether or not they fall within … California Civil Code § 53.5)").

That is the case here, where the California Legislature has codified the right to privacy in consumer's personal reading information in both the California Insurance Information And Privacy Protection Act and the California Financial Information Privacy Act. The IIPPA prohibits the unauthorized disclosure of "any personal or privileged information about an individual collected or received in connection with an insurance transaction." Cal. Ins. Code § 791.13. In the context of the IIPPA, "personal information" is defined as "any individually identifiable information gathered in connection with an insurance transaction from which judgments can be made about an individual's

character, habits, avocations, finances, occupation, general reputation, credit, health, or any other personal characteristics," including "an individual's name and address and 'medical record information.'" Cal. Ins. Code § 791.02(s). The California Financial Information Privacy Act states that "a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates," and defines "[n]onpublic personal information" as any "personally identifiable financial information (1) provided by a consumer to a financial institution, (2) resulting from any transaction with the consumer or any service performed for the consumer, or (3) otherwise obtained by the financial institution." *See* Cal. Fin. Code § 4052.5., Cal. Fin. Code § 4052(a).

As argued above, Defendant is a licensed insurance broker with live agents. Argument § III, *supra*, The IIPPA defines an insurance broker as "a person who, for compensation and on behalf of another person, transacts insurance other than life, disability, or health with, but not on behalf of, an insurer. Cal. Ins. Code § 33. Defendant's argument that the Website is not facilitating insurance transactions contradicts the IIPPA's own definition of what insurance brokers can do: namely, transact insurance. MTD at 21. While it is true that one *aspect* of Defendant's business is the generation of comparative quotes, Defendant has held itself out as an insurance broker to its users. And were Defendant's interpretation of the IIPPA accurate, this would mean that only users directly interfacing with insurance companies—the only institutions capable of determining insurance eligibility through underwriting—would be protected by the IIPPA's privacy regulations. This would render the insurance brokerage market—a market that realized $61.7 billion in 2021—exempt from the IIPPA's privacy regulations.[5] As such, Defendant is regulated by the privacy provisions of the IIPPA, which has enshrined users' right to privacy in the personal information they provide to institutions while searching for and obtaining insurance.

Regardless, Defendant neglects the longstanding privacy protections that courts have afforded to a user's personal, financial information. Argument §§ I.A-I.B, *supra*. And Defendant

[5] *See* U.S Insurance Brokerage Market – Forecast (2026 – 2032), IndustryArc, https://www.industryarc.com/Report/20015/us-insurance-brokerage-market.html

ignores that the clear legislative intent behind these statutes is to accord privacy to consumers' personal financial information. See SAC ¶¶ 16-29.

## VI. PLAINTIFF ALLEGES A VIOLATION OF CIPA § 638.51

### A. CIPA §§ 638.50-638.51 Apply To The Internet Based On The Plain Text Of The Statute

Defendant argues that "CIPA's pen register provision" was aimed solely at "telephonic-style surveillance." MTD at 22-23. "*[E]very* federal court to tackle the CIPA applicability question has rejected [Defendant's] position." *Fregosa v. Mashable, Inc.*, 2026 WL 183857, at *2 (N.D. Cal. Jan. 23, 2026) (emphasis in original). That includes this Court. *Gabrielli v. Haleon US Inc.*, 2025 WL 2494368, at *11 (N.D. Cal. Aug. 29, 2025).

The CIPA defines a "pen register" as a "device or process that records or decodes … information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Pen. Code, § 638.50(b) (emphasis added). "Nothing in th[at] statutory definition limits pen registers to those that operate the same way as a traditional phone pen register." *Fandom*, 754 F. Supp. 3d at 929. To the contrary, the "California Legislature chose[]" "expansive language" for the definition of a "pen register" that "the Court cannot ignore," language that is "specific as to the type of data a pen register collects," but "vague and inclusive as to the form of the collection tool." *Id.* at 928-29 (cleaned up); *see also Fregosa v. Mashable, Inc.*, 2025 WL 2886399, at *9 (N.D. Cal. Oct. 9, 2025) ("The statutory text [of CIPA §§ 638.50-638.51] is deliberately expansive, designed to encompass new technologies and apply to conduct like that alleged here.").

Thus, every federal court and numerous state courts have found that a "pen register" includes internet tracking technology, including some of the exact technology at issue here. *See*, *e.g.*, *Doe v. Talkiatry Management Servs., LLC*, 2025 WL 3190813, at *6-7 (C.D. Cal. Oct. 1, 2025) (finding Facebook tracker was a "pen register"); *In re Meta Pixel Tax Filing Cases*, 793 F. Supp. 3d 1147, 1152-55 (N.D. Cal. 2025) (same); *Fregosa*, 2025 WL 2886399, at *3 (noting "[s]everal judges in this district, including Judges Lin, Orrick, Pitts, Ryu, Tigar, and [Breyer], have held that" "software trackers embedded in websites qualify as 'pen registers' when they collect users' IP addresses, device identifiers, and browsing data"); *Xu*, 2025 WL 3035016, at *3 (finding internet tracking technology

was a "pen register"); *Scarlett v. Future US, LLC*, 2025 WL 2614587, at *4 (San Francisco Super. Ct. Sept. 5, 2025); *Rose v. Variety Media, LLC*, 2025 WL 2794920, at *3 (Los Angeles Super. Ct. Sept. 24, 2025) (same).

Against this weight of authority, Defendant asserts arguments that have been repeatedly rejected. *First*, Defendant cites to CIPA § 638.52 to contend the statute is limited to telephonic technology. MTD at 23. As every federal court has held, that section "merely lists requirements relating to a particular type of pen register … But that does not alter the statutory definition of a pen register stated in § 638.50(b)." *Fandom*, 754 F. Supp. 3d at 930; *see also*, *e.g.*, *Drummer v. Costar Grp., Inc.*, 2025 WL 3190656, at *5 n.2 (C.D. Cal. Oct. 22, 2025) ("Section 638.52 perhaps does not apply to pen registers that collect IP addresses and only to pen registers that collect telephone information, which further undermines any authority Section 638.52 would have in invalidating Plaintiffs' allegations."); *Walsh v. Dollar Tree Stores, Inc.*, 2025 WL 2939229, at *18 (N.D. Cal. Oct. 16, 2025) ("[T]he Court agrees with the [*Fandom*] court's opinion reconciling these sections."). "To the contrary, a fair reading of Section 638.52(d) would allow an officer seeking a judicial order for an online pen register to provide the equivalent of a 'number' for the online device. The broader, more capacious definition of Section 638.50 applies to more devices than the later statutory sections might envision." *Shah v. MyFitnessPal, Inc.*, 2026 WL 216334, at *8 (N.D. Cal. Jan. 27, 2026).

*Second*, Defendant argues that "if the Legislature wanted to apply Section 638.51 to website tracking tools, it could have expressly referenced it in the statute or legislative history … CIPA's legislative history also supports this limitation, as the pen register provision was enacted in 2015, well after the advent and ubiquity of the internet." MTD at 23. In fact, the opposite presumption is true. There is no "such thing as a 'canon of donut holes,' in which [a legislature's] failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 669 (2020). "Instead, when [a legislature] chooses not to include any exceptions to a broad rule, courts apply the broad rule." *Id.* And here, no specific terms were needed because the CIPA adopted the modern definition of a "pen register," which encompasses internet communications. *Fregosa*, 2025 WL 2886399, at *9 ("The statutory text is

deliberately expansive, designed to encompass new technologies and apply to conduct like that alleged here.").[6]

By contrast, had the Legislature intended for CIPA §§ 638.50-638.51 to apply only to telephonic communications, it could have done so, "as evidenced by other sections of CIPA where they imposed such limitations." *Motorola Mobility*, 2025 WL 1939957, at *6 (citing Cal. Pen. Code, §§ 631(a)[i], 632.7); *People v. Hyatt*, 109 Cal. App. 5th 735, 745 (4th Dist. 2025) ("Ordinarily, where the Legislature uses a different word or phrase in one part of a statute than it does in other sections or in a similar statute concerning a related subject, it must be presumed that the Legislature intended a different meaning.") (cleaned up)

*Third*, Defendant argues that Plaintiff's CIPA § 638.51 claim fails because "a website tool identifying its own incoming visitors does not qualify as a 'pen register' device with respect to those visitors." MTD at 23. But Defendant's "argument finds no support in the legislative text, legislative purpose, or the growing body of" caselaw. *Fregosa*, 2025 WL 2886399, at *4. As courts have found, "[n]othing in the statutory definition limits pen registers to those that operate the same way as a traditional phone pen register." *Fandom*, 754 F. Supp. 3d at 929. "All that is required is that the Trackers record addressing information transmitted by the user's computer or smartphone in connection with the outgoing HTTP request to [the] website, regardless of whether that addressing information pertains to the sender or the recipient of the communication at issue." *Id.*; *see also, e.g., Talkiatry Management Servs*, 2025 WL 3190813, at *7 (rejecting argument that "Meta Pixel's tracking Plaintiff's own device's information falls outside the ambit of § 638.51") (cleaned up); *Camplisson*, 2025 WL 3228949, at *8 ("Plaintiffs have sufficiently alleged that the Trackers record Class members' personal information, including the addressing information contained in an IP

---

[6] Specifically, the Legislature adopted the definition of a "pen register" found in the current Federal Pen Register Act, as amended in October 2001. 18 U.S.C. § 3127(3). Courts have found that definition applicable to internet communications. *See*, *e.g.*, *United States v. Soybel*, 13 F.4th 584, 586-87 (7th Cir. 2021) (pen register installed under federal statute "to monitor internet traffic in and out of the building generally and Soybel's unit specifically"); *United States v. Ulbricht*, 858 F.3d 71, 83 (2d Cir. 2017) (same "to monitor Internet Protocol ('IP') address traffic to and from various devices associated with Ulbricht"); *United States v. Gottesfeld*, 319 F. Supp. 3d 548, 562 (D. Mass. 2018) ("[T]he government obtained a Pen Register/Trap and Trace order … allowing it to collect IP addresses used to send communications to, and receive communications from, defendant's IP address for a period of 60 days."

address, and thus plausibly constitute pen registers."). Thus, it is immaterial whether the information collected is Plaintiff's so long as it is associated with the outgoing "original GET request sent to the host website," as it is here. *See, e.g.*, SAC ¶¶ 38, 41-45.

*Finally*, Defendant contends that "[c]ontrary to Penning's expansive theory, Section 638.51 is a penal statute that should be construed strictly," and is subject to the rule of lenity. MTD at 24 (cleaned up). On the contrary, "[t]he rule of the common law, that penal statutes are to be strictly construed, has no application to this Code." Cal. Pen. Code § 4. Thus, it is unclear whether this rule applies. Regardless, the rule of lenity only applies "when a criminal statute contains a grievous ambiguity or uncertainty." *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (cleaned up). Here, the CIPA "contains no grievous ambiguity: its language, structure, history, and purpose are sufficiently clear." *Fregosa*, 2025 WL 2886399, at *9. Thus, the California Supreme Court has rejected the rule of lenity's application to disputed provisions of the CIPA. *See Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 202 (2021) (rejecting application of rule of lenity to CIPA § 632.7). And courts have rejected the rule of lenity's application to CIPA §§ 638.50-638.51. *See*, *e.g.*, *Lewis v. Magnite, Inc.*, 2025 WL 3687546, at *13 (C.D. Cal. Dec. 4, 2025) (finding "no ambiguity regarding the application of § 638.50 to these facts"); *Riganian*, 791 F. Supp. 3d at 1094 ("LiveRamp … has not established [] any 'grievous ambiguity' in the statute's express language."); *Deivaprakash*, 798 F. Supp. 3d at 1108 ("[T]he application of the CIPA to the allegations … does not require the interpretation of any ambiguities in the statute…").

### B. Meta and Google Record "Routing, Signaling, Or Addressing" Information

Defendant concedes that IP addresses are "routing, addressing, or signaling information," but argues device identifiers are not. MTD at 25. Again, courts have disagreed. *See*, *e.g.*, *Fregosa*, 2025 WL 2886399, at *5 ("Device 'fingerprints' likewise serve as unique identifiers across websites and browsing sessions."); *Camplisson*, 2025 WL 3228949, at *1 ("pen register" alleged where trackers recorded "IP address … unique identifiers … device details … and browser information"); *Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921, 930 (C.D. Cal. 2025) (same where "the software collects not just IP addresses, but also operating system information [and] browser

information"); *Wright v. TrueCare Property Holdings, LLC*, 2025 WL 3248749, at *4 (S.D. Cal. Nov. 21, 2025) ("Data capable of being associated with a user's identity falls within the statutory definition of addressing information.").

*Tsering v. Meta Platforms, Inc.*, 2026 WL 89320 (N.D. Cal. Jan. 12, 2026), is distinguishable. In *Tsering*, 2026 WL 89320, at *6, the plaintiff did not "adequately allege what exactly the electronic communication at issue was, and thus fails to allege that the information collected did not constitute the content of such communication." In other words, the issue in *Tsering* was that there was no allegation that the information collected was associated with *any* communication, and was therefore "routing, addressing, or signaling" information. At best, it was akin to someone saying in an e-mail what their e-mail address was. Here, by contrast, Plaintiff alleges that the Third Party pixels recorded addressing information like unique user identifiers and hashed e-mail addresses (SAC ¶ 173) "associated with [] communications" "with the Website" to input information or load assets. SAC ¶ 46. That information is "routing, addressing, or signaling information" because it is "capable of being associated with a user's identity" (*Wright*, 2025 WL 3248749, at *4) and was used to match "users to profiles held by the Third Parties" (SAC ¶ 46), thereby being used to direct users' communications to specific profiles. In short, Plaintiff alleges that: (1) there are communications between Website users and Defendant's Website; and (2) associated with those communications (and recorded by Meta and Google) is routing and address information about those users, too. As such, Defendant enables Google and Meta to record qualifying data as defined in Cal. Pen. Code § 638.50(b).

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's Motions. If the Court grants the Motion to Dismiss in any respect, Penning respectfully requests leave to amend. *See Roney v. Miller*, 705 F. App'x 670, 671 (9th Cir. 2017).

Dated: February 6, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: /s/ Philip L. Fraietta
Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiff*