Christopher W. James (SBN 289047)
Meghan Natenson (SBN 312634)
Lillian Sun (SBN 334071)
VINSON & ELKINS LLP
555 Mission Street, Suite 2000
San Francisco, California 94105
Telephone: 415.979.6900
Facsimile: 415.651.8786
cjames@velaw.com
mnatenson@velaw.com
lsun@velaw.com

*Attorneys for Defendant*
INSURANCEZEBRA, INC., d/b/a THE ZEBRA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STACY PENNING, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INSURANCEZEBRA, INC., d/b/a THE ZEBRA,<br><br>Defendant. | Case No.: 3:25-cv-03531-WHO<br><br>**REPLY BRIEF IN FURTHER SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Hearing Date: March 25, 2026<br>Time: 2:00 pm<br>Courtroom: 2 – 17th Floor<br>Judge: Hon. William H. Orrick<br><br>Trial Date: None Set |

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| I. | Plaintiff was on inquiry notice of the privacy policy and his consent bars each claim. | 2 |
| II. | ECPA's crime-tort exception does not apply. | 5 |
| III. | Failure to allege standing or interception of "in transit" "content" for wiretapping. | 7 |
| | A. Plaintiff's failure to sufficiently describe his interactions with the Website precludes Article III standing for his wiretapping claims. | 7 |
| | B. Plaintiff fails to allege any "contents" were read or learned "in transit." | 8 |
| | C. Plaintiff fails to establish that The Zebra aided a CIPA § 631(a) violation. | 9 |
| IV. | Plaintiff has not alleged a "confidential communication" under CIPA § 632. | 10 |
| V. | Plaintiff's pen register claim must be dismissed. | 12 |
| | A. Plaintiff lacks a traditionally actionable harm from his alleged pen register claim. | 12 |
| | B. The pen register statute does not apply here. | 14 |
| | C. Google and Meta do not collect DRAS information. | 15 |
| VI. | Conclusion | 15 |

## TABLE OF AUTHORITIES

**Cases**

*Allison v. United Wholesale Mortg.*,
No. 25-cv-05377-WHO, 2025 WL 3702863 (N.D. Cal. Dec. 21, 2025) .......... 3

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .......... 3, 4

*Blalock v. EquipmentShare.com Inc.*, No. 30-2025-01508739-CU-MC-CJC,
2026 WL 330067 (Cal. Super. Jan. 27, 2026) .......... 14

*Brown v. Google*,
525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021) .......... 6

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) .......... 1

*Cammorata v. Sonifi Solutions, Inc.*,
No. 25STCV25259, 2026 WL 500856 (Cal. Super. Feb. 18, 2026) .......... 14

*Chabolla v. ClassPass Inc.*,
129 F.4th 1147, 1157 (9th Cir. 2025) .......... 4

*Cousins v. Lockyer*,
568 F.3d 1063 (9th Cir. 2009) .......... 2

*Dawidzik v. Tesla, Inc.*,
No. cv 25-01982, 2025 WL 3786963 (C.D. Cal. Dec. 29, 2025) .......... 13

*Deivaprakash v. Conde Nast Digital*,
798 F. Supp. 3d 1100 (N.D. Cal. 2025) .......... 12

*Doe v. Eating Recovery Ctr. LLC*,
806 F.Supp.3d 1109 (N.D. Cal. 2025) .......... 9, 14

*Doe v. Tenet Healthcare Corp.*,
789 F. Supp. 3d 814 (E.D. Cal. 2025) .......... 6

*Edwards v. MUBI, Inc.*,
773 F.Supp.3d 868 (N.D. Cal. 2025) .......... 4

*Gabrielli v. Motorola Mobility LLC*,
No. 24-cv-09533-JST, 2025 WL 1939957 (N.D. Cal. July 14, 2025) .......... 13

*Gilligan v. Experian Data Corp.*,
No. 25-cv-02873-RFL, 2026 WL 32259 (N.D. Cal. Jan. 6, 2026) .......... 6, 13

*Gruber v. Yelp Inc.*,
55 Cal. App. 5th 591 (2020) .......... 10

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) .......... 9

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 13

*In re Google Inc.*,
No. 13-md-2430-LHK, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ........ 5

*In re Google Inc. Gmail Litig.*,
No. 13-md-2430-LHK, 2014 WL 1102660 (N.D. Cal. March 18, 2014) ........ 5

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ........ 5

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) ........ 8

*Javier v. Assurance IQ, LLC*,
649 F. Supp. 3d 891 (N.D. Cal. 2023) ........ 11

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F. 4th 1005 (9th Cir. 2024) ........ 4

*Khamooshi v. Politico LLC*,
786 F. Supp. 3d 1174 (N.D. Cal. 2025) ........ 12

*King v. Hard Rock Cafe Int'l (USA), Inc.*,
No. 24-cv-1119, 2025 WL 1635419 (E.D. Cal. June 9, 2025) ........ 8, 11

*Krzyzek v. OpenX Techs., Inc.*,
No. 25-cv-05588-SI, 2026 WL 206855 (N.D. Cal. Jan. 27, 2026) ........ 6, 13

*Libman v. Apple, Inc.*,
No. 22-cv-7069-EJD, 2024 WL 4314791 (N.D. Cal. Sept. 26, 2024) ........ 10, 11

*Marden v. LMND Med. Grp., Inc.*,
No. 23-cv-03288-RFL, 2024 WL 4448684 (N.D. Cal. July 3, 2024) ........ 6

*Mitchener v. CuriosityStream, Inc.*,
No. 25-cv-1471-NW, 2025 WL 2272413 (N.D. Cal. Aug. 6, 2025) ........ 8

*Oberstein v. Live Nation Entm't, Inc.*,
60 F.4th 505 (9th Cir. 2023) ........ 3

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ........ 12, 13

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. July 18, 2025) ........ 6

*Rojas v. HSBC Card Servs. Inc.*,
93 Cal. App. 5th 860 (2023) ........ 2

*Schlueter-Beckner v. Simplisafe, Inc.*,
No. 3:25-cv-01764 (CRB), 2025 WL 2162948 (N.D. Cal. July 30, 2025) ........ 4

*Semien v. PubMatic Inc.*,
No. 25-cv-03164-SI, 2026 WL 216333 (N.D. Cal. Jan. 27, 2026) ........ 13

*Shah v. Fandom*,
754 F. Supp. 3d 925 (N.D. Cal. 2024) ........ 11, 14

*Smith v. YETI Coolers, LLC*,
754 F. Supp. 3d 933 (N.D. Cal. 2024) .......... 10

*Torres v. Prudential Fin., Inc.*,
No. 22-cv-7465-CRB, 2025 WL 1135088 (N.D. Cal. Apr. 17, 2025) .......... 9

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 12

*Tsering v. Meta Platforms, Inc.*,
No. 25-cv-1611-RFL, 2026 WL 89320 (N.D. Cal. Jan. 12, 2026) .......... 15

*United States v. Forrester*,
512 F.3d 500 (9th Cir. 2008) .......... 8

*Yockey v. Salesforce, Inc.*,
745 F. Supp. 3d 945 (N.D. Cal. 2024) .......... 11

*Yoon v. Meta Platforms, Inc.*,
No. 24-cv-2612-NC, 2024 WL 5264041 (N.D. Cal. Dec. 30, 2024) .......... 9, 11

**Statutes**

18 U.S.C. § 2511(d) .......... 2, 5

Cal. Ins. Code § 637.2 .......... 12

Cal. Ins. Code § 791.02(m) .......... 12

Cal. Pen. Code § 631(a) .......... 2, 9, 10

Cal. Pen. Code § 632 .......... 1, 2, 10, 11

Cal. Pen. Code § 638.51(b)(5) .......... 2, 15

**Other Authorities**

Order Granting Stip. to Stay Case Pending Ruling from California Court of Appeal
(Dkt. No. 82), *Fregosa v. Mashable, Inc.*, No. 25-cv-1094-CRB (Feb. 19, 2026) .......... 15

*Variety Media, LLC v. the Super. Ct. of Los Angeles Cty.*, Case No. B350578 (Jan. 8, 2026) .......... 14, 15

What the Opposition omits reveals more about Plaintiff's case theory than what it affirmatively argues. Fatal defects identified in The Zebra's Motion to Dismiss are repeatedly ignored, warranting dismissal of each cause of action.

*First*, Plaintiff concedes that consent defeats each cause of action, and does not dispute that The Zebra's Privacy Policy disclosed the alleged data collection complained of in the SAC. Penning also concedes that he was presented with an advisal, stating that "By clicking 'Save & continue,' you… agree to The Zebra's Privacy Policy," and that he clicked the very "Save & continue" button directly below that advisal. Penning's exposure to and interaction with this reasonably conspicuous textual notice is a valid form of consent. It ends the inquiry for each cause. *Infra* Part I.

*Second*, Plaintiff relies heavily on financial and insurance confidentiality statues (GLBA, CalFIPA, IIPPA) to argue for both an exception to ECPA's single-party consent rule and heightened "confidentiality" protections for purposes of CIPA § 632. These arguments fail for several reasons. But what stands out most is that the Opposition does not dispute Penning's limited interaction with The Zebra's Website falls short of an "insurance transaction" or qualifying him as a "consumer," as required. *Infra* Parts II, IV. Plaintiff does not even attempt to respond to the Motion's argument, despite the fact that the Court itself specifically directed Plaintiff to address these qualifications in its Order Granting Defendant's Motion to Dismiss the First Amended Complaint ("Order") (Dkt. 40).

*Third*, the Opposition ignores critical defects as to Article III standing. *See* Mot. (Dkt. 49-1) at 6-11. Penning must (but fails to) show standing with respect to each cause of action. *California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018) ("Standing as to one claim does not suffice for all claims arising from the same nucleus of operative fact.") (citation omitted). The Opposition fails to address the lack of sufficient detail about Penning's use of the Website tools, particularly which question he answered *first* for purposes of the alleged form_start event. As such, he alleges only what types of information he provided to The Zebra, but not what really matters: what information was actually captured by third parties. He thus fails to allege an injury sufficient for Article III standing, or to state a claim, for purposes of his wiretapping and confidential recording causes of action. *Infra* Part III.A. Plaintiff separately fails to establish that he has suffered a concrete, particularized harm caused by The Zebra's conduct for his pen register claims. *Infra* Part V.A.

These failures doom each cause of action. Plaintiff has had multiple bites at the apple, and repeatedly ignored or failed to cure these issues (and multiple other claim-specific defects addressed below). The Court can and should dismiss the SAC with prejudice.

**I. Plaintiff was on inquiry notice of the Privacy Policy and his consent bars each claim.**

Penning's consent to The Zebra's Privacy Policy bars each claim. First, "lack of consent is a required element" of multiple causes of action, not simply an affirmative defense. *See Rojas v. HSBC Card Servs. Inc.*, 93 Cal. App. 5th 860, 889 (2023).[1] Penning must (but fails to) plead facts that create a plausible inference that he did not consent to the alleged data sharing. The "conclusory allegation[]" that he never consented is "insufficient to avoid" dismissal. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009) (citation omitted); Order at 1 ("Penning's lack of specificity in the FAC calls into question whether he … was on notice inquiry of defendant's Terms of Service and Privacy Policy").

Penning does not dispute that consent defeats each cause of action. He does not challenge judicial notice of the materials submitted by The Zebra showing the disclosures made to Website visitors at the time of Penning's alleged visit. Nor does he dispute that the Privacy Policy discloses precisely the type of information collection and sharing at issue in the SAC, including the alleged sharing of information with Facebook and Google for analytics and remarketing purposes. *See* Mot. at 4; Del Rosario Ex. B (Dkt. 49-5). In fact, the Opposition does not make a single reference to the Privacy Policy's language; it thus concedes the disclosures in the Policy were sufficient.

Instead, Penning only asserts that users were not appropriately directed to the Privacy Policy. *See* Opp. at 10.[2] This is wrong. Website visitors who use the auto tool funnel, as Penning did, are put on inquiry notice of and necessarily assent to the Privacy Policy. *See* Mot. at 3-4. These users are presented with a reasonably conspicuous advisal at the outset of the tool, stating that when they click

[1] *See* 18 U.S.C. § 2511(d) (no violation "where one of the parties to the communication has given prior consent to such interception"); Cal. Pen. Code § 631(a) (violative conduct must be "without the consent of all parties to the communication"); § 632 (similar); § 638.51(b)(5) (no violation if "consent of the user … has been obtained").

[2] The same argument is made against enforcement of the Website's Terms, opposing The Zebra's Motion to Transfer Venue. The Opposition's "consent" defense merely refers the Court to its earlier assessment of the Terms. Opp. at 2-6, 10. Defendant's concurrently filed Reply in Further Support of its Motion to Transfer Venue addresses that argument, including greater detail comparing The Zebra's Website screenshots to other federal precedent.

"Save & continue" (required to progress through the tool), they agree to the hyperlinked Privacy Policy and Terms of Service. *See id*. at 3; Del Rosario Ex. D (Dkt. 49-7) at 2. Penning allegedly used the auto tool to generate an estimate (SAC ¶ 108), and does not dispute that he was thus necessarily presented with the advisal and clicked the "Save & continue" button immediately below it. These concessions cannot be squared with the SAC's bare allegation that Penning never consented (SAC ¶¶ 112, 115). His notice and acceptance of the Policy warrants dismissal. *See Allison v. United Wholesale Mortg.*, No. 25-cv-5377-WHO, 2025 WL 3702863, at *5-6 (N.D. Cal. Dec. 21, 2025).

The Opposition incorrectly argues that the advisal was too inconspicuous. First, the standard is one of *reasonableness*—whether "a reasonable user would have seen the notice." *Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505, 515-16 (9th Cir. 2023). The Zebra's advisal easily satisfies this standard. It measures well in each factor listed in the Opposition: "(1) the size of the text; (2) the color of the text as compared to the background it appears against; (3) the location of the text and … its proximity to any box or button the user must click to continue use of the website; (4) the obviousness of any associated hyperlink; and (5) whether other elements on the screen clutter or otherwise obscure the textual notice." Opp. at 3 (citation omitted). The Zebra's advisal was presented: (1) in a font size similar to other text throughout the screen (including the associated "Save & continue" button); (2) in a dark font on a light background; (3) directly above the form's "Save & continue" button, and spanning the full width of the page; (4) using hyperlinks for the Terms and Privacy Policy in blue, underlined font; and (5) on an clear and uncluttered webpage, with sufficient spacing from other elements. *See* Del Rosario Ex. D at 2. The advisal was "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).

The Opposition criticizes The Zebra's advisal text size, claiming it is "tiny font" smaller than "surrounding website elements," which leaves it "sandwiched between other larger elements." Opp. at 3-4 (citing *Berman*, 30 F.4th at 856). But in order to make this point, the Opposition shrinks the image—a full-page landscape website screenshot from a widescreen computer monitor—to one third of a page on a wide-margined portrait oriented pleading paper. Opp. at 3. In reality, the font is comparable in size to the surrounding elements on the page (e.g., the "Save & Continue" button); the

advisal has ample spacing from other website elements; and the webpage as a whole is uncluttered and free from distractions. *See* Del Rosario Ex. D at 2. Indeed, the Ninth Circuit has enforced notices even where the advisal text size is smaller than all other website elements, and where highly distracting graphics dominate the page. *E.g.*, *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F. 4th 1005 (9th Cir. 2024) (smaller notice text below action button was sufficient, despite distracting dragon and iron-throne background graphics).

The Zebra's advisal is even more conspicuous. The Opposition ignores The Zebra's use of contrasting blue, underlined font for its hyperlinks—a critical feature in courts' analyses. *E.g.*, *Berman*, 30 F.4th at 857 (rejecting notice where hyperlinks were merely underlined, and insisting that webpage should "denot[e] the existence of a hyperlink [through] the use of a contrasting font color (typically blue)"). Also, the positioning of The Zebra's advisal—directly above its associated action button, aligned with the other headings on the page, and spanning the full width of the page—guarantees that a visitor's eye must pass over the notice before reaching the "Save & continue" button. This contrasts with Penning's authorities, all of which featured notice text that was either forced entirely to the side, or fell far below the associated action button. *See Schlueter-Beckner v. Simplisafe, Inc.*, No. 3:25-cv-01764 (CRB), 2025 WL 2162948 at *4 (N.D. Cal. July 30, 2025) ("disclosure was located off to the side"); *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1157, 1174 (9th Cir. 2025) (advisal was below the "Continue" action button and sat beneath other webpage elements, so site visitor would not continue reading down the page before clicking); *Edwards v. MUBI, Inc.*, 773 F.Supp.3d 868, 883 (N.D. Cal. 2025) (advisal at the bottom of webpage, so "user must scroll down a significant distance" from the action button).

The Opposition also argues the advisal's grammar was unclear as to what act constitutes assent. Opp. at 6. But a plain reading of the advisal belies such argument. Plaintiff dissects the short advisal and reads each clause and sentence in strict isolation, insisting the phrase "By clicking 'Save & continue,' you …" can only modify the clause that *immediately* follows it, and does not extend to the phrase "[y]ou also agree to the The Zebra's Privacy Policy." *Id.* This contrived narrow reading ignores the use of the word "also," which indicates the phrase agreeing to the Privacy Policy is not meant to be read in isolation but as an *additional* consequence of the preceding action. This notice

explicitly advises the significance of clicking "Save & continue," which Penning did.

Regardless, consent is not a matter of strict contract formation, and can be explicit or implied, as long as the consent is actual. *In re Google Inc. Gmail Litig.*, No. 13-md-2430-LHK, 2014 WL 1102660, at *12 (N.D. Cal. March 18, 2014); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793 (N.D. Cal. 2022). For actual consent, "the disclosures must 'explicitly notify' users of the practice at issue." *Id.* (citations omitted). The Zebra's Privacy Policy does exactly this; it discloses the Website's use of Meta and Google tools for targeted advertising purposes. And the advisal explicitly refers the user to the Privacy Policy. Accordingly, "a reasonable user who viewed [the] disclosures would have understood that [The Zebra] was collecting the information." *Id*. It is not required that Plaintiff performed some affirmative act in order to have notice of the Privacy Policy (though he did). Penning concedes that he was presented with the relevant advisal, conspicuously linking the Privacy Policy, and that the Privacy Policy sufficiently discloses the data collection and sharing at issue. He has consented, and thus all his claims fail.

## II. ECPA's crime-tort exception does not apply.

The parties agree that "there can be no violation of ECPA if 'one of the parties to the communication has given prior consent.'" Opp. at 11; U.S.C. § 2511(d). Thus, to survive dismissal, Plaintiff's ECPA claim must fall within a narrow "crime-tort" exception (notwithstanding the several other independent bases for dismissal). *Id.* But the exception is inapplicable here. *See* Mot. at 12-14.

First, even if the presence of financial motivations does not entirely immunize or insulate a Defendant from the crime-tort exception, the exception applies "only where the '*primary* motivation or a determining factor in [the interceptor's] actions has been to injure plaintiffs tortiously.'" *In re Google Inc.*, No. 13-md-2430-LHK, 2013 WL 5423918, at *18, fn.13 (N.D. Cal. Sept. 26, 2013) (emphasis added). Where, as here, the *primary* motivation is not "to perpetuate torts on millions of Internet users, but to make money," the exception does not apply. *Id.* The Opposition reiterates that The Zebra's purpose was to use the collected information to facilitate its own targeted advertising. Opp. at 12. That is not a tortious purpose.[3] The SAC hangs its exception bid on supposed violations

[3] The Opposition's authorities (Opp. at 11-12) are distinguishable; none involved a singular website operator with no direct role in third parties' use of the data for profile-building purposes. *See Riganian*

of GLBA and CalFIPA, but Penning offers no authority supporting the crime-tort exception on that basis,[4] or fails to show that violation of those statutes was The Zebra's primary motivation. The Zebra also disclosed the sharing at issue, which is all that is expected under these statues. *Supra* Part I.

Regardless, the Opposition ignores that Penning's limited use of the Website does not qualify him as a "consumer" under GLBA or CalFIPA. Mot. at 13-14 (these statutes only restrict financial institutions' disclosure of "nonpublic personal information" provided by a "consumer"). The Opposition focuses only on one side of the equation (whether The Zebra qualifies as a covered "financial institution"), while apparently conceding the other (that Penning fails to qualify as a "consumer"). Opp. at 12. The SAC only offers a bald recitation of statutory text. SAC ¶ 160. The omission of any supporting factual allegations is fatal, particularly considering that The Zebra has raised the issue multiple times and the Court specifically directed Penning to "add facts to plausibly support that he is a 'consumer' protected by" GLPA and CalFIPA. Order at 2.

The reality is that Penning cannot plausibly allege that he is a qualifying "consumer." His own argument as to why The Zebra should qualify as a "financial institution" underscores the point. He asserts that The Zebra qualifies as a "financial institution" when acting "[i]n its capacity as an insurance broker," claiming the company is "a licensed insurance broker with live agents" that *can* transact insurance. Opp. at 12, 19 (making similar arguments for IIPPA). But Penning concedes that the aspect of The Zebra's business specifically used by Penning—the generation of comparative

*v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1091 (N.D. Cal. July 18, 2025) (defendant intercepted communications "for the purpose of 'associating their data with preexisting [identity] profiles' and then preparing that data for sale on [defendant's] data marketplace"); *Krzyzek v. OpenX Techs., Inc.*, No. 25-cv-5588-SI, 2026 WL 206855 (N.D. Cal. Jan. 27, 2026) (defendant's pixel tracked plaintiff's activity across websites and compiled detailed user profiles); *Gilligan v. Experian Data Corp.*, No. 25-cv-2873-RFL, 2026 WL 32259 (N.D. Cal. Jan. 6, 2026) (defendant compiled detailed profiles of plaintiffs' online browsing activity across the internet).

[4] Penning's authorities are inapposite. In *Brown v. Google*, the exception was applied against Google for tracking users in private mode. 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021). But contrary to the Opposition's mischaracterization of the case, it was not the mere "association of [plaintiffs'] data with preexisting user profiles" that constituted a secondary criminal or tortious purpose. The exception applied because Google allegedly (a) collected that data by circumventing user's technical barriers (in violation of CDAFA), and (b) violated privacy expectations in a highly offensive manner by false representing that such data would not be collected (amounting to an intrusion on seclusion). *Id.* at 1074-1080. The Zebra is not alleged to have done anything of the sort. Nor is The Zebra alleged to have collected and intentionally sent highly sensitive health information to Google or Facebook. *Compare Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 848-50 (E.D. Cal. 2025); *Marden v. LMND Med. Grp., Inc.*, 2024 WL 4448684, at *3 (N.D. Cal. July 3, 2024).

quotes—is distinct. Opp. at 19. And he does not dispute that his "use of the website stopped far short of using The Zebra as an agent or broker for any insurance policy." Opp. at 12. He simply argues that those distinctions do not alter "whether [The Zebra] is a financial institution *in general*." *Id.* But those distinctions matter for Penning to qualify as a protected "consumer." Plaintiff does not allege that he ever entered an insurance transaction with The Zebra or that The Zebra acted as an insurance broker on his behalf, and the Opposition offers no authority to support that the receipt of preliminary price estimates qualifies him. He is not a "consumer," so his related request for an exception under the ECPA also fails. After multiple bites at the apple, this claim should be dismissed with prejudice.

## III. Failure to allege standing or interception of "in transit" "content" for wiretapping.

The Opposition fails to address the fundamental deficiencies identified in both the Motion and this Court's prior order dismissing the FAC: Plaintiff fails to establish Article III standing or plead The Zebra "aided" interception of "in transit" "contents" for purposes of his wiretapping claims.

### A. Plaintiff's failure to sufficiently describe his interactions with the Website precludes Article III standing for his wiretapping claims.

The SAC fails to state a claim or establish a concrete injury for wiretapping because Plaintiff has not plausibly alleged what content of his communications was actually intercepted. The Opposition is correct that Plaintiff has now alleged that he submitted various information to The Zebra when he used the Website's auto tool. Opp. at 9. But that misses the point. What matters is what, if any, of that information was captured by third parties. Penning fails to plausibly allege that Facebook and Google actually collected the substance of any of his responses submitted to The Zebra.

The Opposition does not dispute that the "form_start" event marks only the user's *first* interaction with the Website's tools. Mot. at 9. And though Plaintiff identifies different categories of information he submitted in the tool, he does not allege what information he provided *first*. SAC ¶ 108. He cannot broadly assert all of his vaguely enumerated communication content was intercepted by virtue of this limited form_start event, and he identifies no other means by which the Google or Meta tools captured this content. Penning also does not dispute that the first question posed in the auto tool was actually a request for his zip code. Mot. at 9. Nor that the form_start event does not capture a user's text response to this type of question. *Id*. at 9 fn 6. The Opposition simply ignores this nuance. And by failing to specify the order in which he answered The Zebra's form questions,

Plaintiff cannot plausibly allege what (if any) of his form responses were actually captured by a third party. He thus fails to establish an individualized, concrete injury. *See, e.g.*, *Mitchener v. CuriosityStream, Inc.*, No. 25-cv-1471-NW, 2025 WL 2272413, at *5 (N.D. Cal. Aug. 6, 2025) (dismissing CIPA claim where, "though [p]laintiff alleges that [d]efendants *could* gain 'additional information about [a] visitor . . . ,' and that allegation *could* intrude on [p]laintiff's right to privacy, he fails to convert that hypothetical into concrete harm to *him*") (original emphasis).

**B. Plaintiff fails to allege any "contents" were read or learned "in transit."**

Even if Penning had standing, he fails to state a wiretapping claim. At most, he alleges capture of sanitized URLs reflecting what pages he viewed—merely a record that he used the Website's auto tool. The Opposition leaps to the conclusion that this amounts to "contents" that "constitute the substance of the message itself" (Opp. at 13), despite the fact that the substance of Penning's form submissions was not actually intercepted. Plaintiff argues the SAC includes illustrative screenshots showing "a Google user" looked for auto insurance as a driver who is currently insured (Opp. at 13)—but does not dispute this was his counsel's ad hoc investigation, not reflective of his own experience. *See* Mot. at 9.[5] Again, Plaintiff does not plausibly allege any of his own form responses were captured, precluding the Court from evaluating whether any potential "content" is at issue. *See King v. Hard Rock Cafe Int'l (USA), Inc.*, No. 24-cv-1119, 2025 WL 1635419 (E.D. Cal. June 9, 2025) (dismissing CIPA claims because plaintiff failed to allege her own search terms that were captured).

The SAC's URL examples are also devoid of any search queries or content input by a user. For Penning, the only relevant URL offered is: https://www.thezebra.com/insurance/car/results/. The Ninth Circuit draws a clear distinction between the substance of a communication and non-content routing information, such as URLs and page views. *See United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) (collection of such information, even though it "strongly indicate[s] the underlying content," is not interception of "contents" because it reveals only that a communication occurred, not its substantive meaning). Courts consistently differentiate sanitized URLs from those with users' inputs. *E.g.*, *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1108-09 (9th Cir. 2014) (distinguishing URLs

[5] Allegations regarding the home insurance tool are also irrelevant, as Penning did not use that tool.

that disclose a "search term or similar communication" from URLs that merely reflect a webpage's address); *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1093 (N.D. Cal. 2022) (no "contents" where user inputs not intercepted); *Yoon v. Meta Platforms, Inc.*, No. 24-cv-2612-NC, 2024 WL 5264041, at *6 (N.D. Cal. Dec. 30, 2024) ("button clicks and pages viewed are record information"). The Zebra's URL reveals only that a user reached a "results" page related to car insurance.

Even if Penning had plausibly alleged "contents" (he has not), the claim independently fails because the SAC does not allege those contents were read or learned while the communications were "in transit," as required by CIPA § 631(a). Penning claims that "Meta acquires [] communications contemporaneously or simultaneously with their actions on The Zebra funnel," pointing to screenshots in the SAC of data transmissions. Opp. at 14 (citing SAC ¶ 40). Again, Penning makes an untenable logical leap that just because information may be transmitted or acquired in real time, that it is actually read or learned at that point. The Opposition's authorities do not support such a leap. They repeatedly address the timing of "interception" (Opp. at 14-15), but CIPA does not criminalize mere interception; it requires more. *Doe v. Eating Recovery Ctr. LLC*, 806 F.Supp.3d 1109, at 1117-18 (N.D. Cal. 2025) ("you must do something more than just intercept the communication while it is in transit to be held liable"). The SAC's own allegations undermine contemporaneous "reading" or "learning." Penning alleges that Google "receives the electronic communications" and that the information is "*then* analyzed by Google." SAC ¶¶ 95-96 (emphasis added). That is not reading in transit; it is post-receipt data processing, a theory precisely rejected by this District. *See Torres v. Prudential Fin., Inc.*, No. 22-cv-7465-CRB, 2025 WL 1135088 (N.D. Cal. Apr. 17, 2025) (in-transit requirement not satisfied when third party intercepted communications and stored them in a server). Indeed, in one of the few cases in this area to reach summary judgment— i.e., with the benefit of an actual examination of these tools—Judge Chhabria ruled that Meta's pixel does not satisfy CIPA § 631(a) wiretapping's "in transit" requirement because of the various processing steps that occur before any data is analyzed. *Eating Recovery Ctr*, 806 F.Supp.3d at 1117.

**C. Plaintiff fails to establish that The Zebra aided a CIPA § 631(a) violation.**

Plaintiff incredibly asserts that the intent standard for CIPA § 631(a)—a criminal statute—must be read broadly because it was "meant to apply to a broad swath of *non-criminal* conduct." Opp.

at 15 (emphasis added). That view is at the core of many CIPA cases that have flooded the courts over the last few years. It is wrong. This is a criminal statute: while The Zebra is alleged to have integrated Meta's and Google's tools on the Website, it is not just the operation of those tools that is a violation. The Zebra must have acted with Meta and Google "*in order to* have [Meta and Google] perform acts that violate the statute." *Smith v. YETI Coolers, LLC*, 754 F. Supp. 3d 933, 942 (N.D. Cal. 2024) (original emphasis). At minimum, this requires that The Zebra had both knowledge of their conduct, and a purpose of aiding, agreeing with, or employing them to commit the acts. *Id*. But it is undisputed that Google's description of the form_start event omits the use of the particular sub-parameters the SAC claims captured inappropriate content. Mot. at 18, n. 13. To the extent Penning relies on that event for his wiretapping claim, the SAC does not plausibly allege The Zebra was even aware this specific information was being captured.

Moreover, the Opposition does not dispute that The Zebra's liability is necessarily derivative of Google or Meta themselves violating CIPA § 631(a). Mot. at 19. But neither Google or Meta are alleged to have acted with the intent to intercept users' site activity without consent. There are no allegations that Meta or Google knew whether any particular user had provided consent, nor could they plausibly have formed the specific intent to intercept communications "without consent" within the meaning of § 631(a) absent such knowledge. Without allegations that the alleged primary actors possessed the requisite statutory intent, Plaintiff cannot bootstrap an aiding claim against The Zebra.

**IV. Plaintiff has not alleged a "confidential communication" under CIPA § 632.**

Penning's CIPA § 632 claim likewise fails. He has not (and cannot) allege that the substance of his auto tool form responses were intercepted or recorded. CIPA § 632(a) requires more than the capture of system events or sanitized URLs; it applies only to the recording of a "confidential communication." The term "communication" in this context "connotes a singular conversation or exchange between two or more participants." *Libman v. Apple, Inc.*, No. 22-cv-7069-EJD, 2024 WL 4314791, at *13 (N.D. Cal. Sept. 26, 2024) (quoting *Gruber v. Yelp Inc.*, 55 Cal. App. 5th 591, 607 (2020)). Plaintiff does not allege that any conversational exchange was recorded. Instead, he cites the capture of metadata and event-level analytics—that a user was interested in insurance, the general type of insurance, and a single "form_start" subparameter—and labels that highly limited information

(without any legal authority) a qualifying "communication." Opp. at 17. But this merely describes the automated logging of high-level categorical user activity, which is materially indistinguishable from the non-communicative data rejected in *Libman*.

Moreover, Plaintiff still misreads CIPA § 632's definition of "confidential." A communication is "confidential" only if a party desires it to be "confined to the parties thereto." Cal. Penal Code § 632(c). Penning seemingly concedes that he expected his communications to be shared with other parties (such as insurance companies). He claims, however, that is "far different than whether Plaintiff expected those communications to be intercepted by … social media or advertising companies without any notice or consent."[6] Opp. at 17. Not for purposes of § 632. A user who knowingly provides information to a platform designed to disseminate it to external third parties cannot reasonably expect those communications remain "confined to the parties thereto." This is not a red herring (Opp. at 17)—it is the precise statutory inquiry. Plaintiff's selective focus on which third parties he now wishes to exclude cannot override the statute's plain language.

The Opposition cites three cases on this issue, but none involve instances where the plaintiff, as here, was aware (and desired) that his information would be shared with various unnamed external third parties. The Opposition's citations all concern *consent* to sharing information with particular third parties, which is a separate inquiry. *See Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 896 (N.D. Cal. 2023) (no § 632 claim, and only evaluating the issue of implied consent); *Yockey v. Salesforce, Inc.*, 745 F. Supp. 3d 945, at 957 (N.D. Cal. 2024) (considering whether consent was given for Salesforce to record a discussion with a medical provider under a different statute); *Shah v. Fandom*, 754 F. Supp. 3d 925 (N.D. Cal. 2024) (no § 632 claim or definition of a "confidential" communication, but rather whether consent to disclose an IP address to a website should be extended to other third parties). None of these cases address the question at hand.

Penning must also overcome the widely accepted presumption "that Internet communications do not have an objectively reasonable expectation of confidentiality." *Yoon v. Meta Platforms, Inc.*, 2024 WL 5264041, at *6. A "plaintiff must plead something unique about particular internet communications to demonstrate those communications are confidential." *King*, 2025 WL 1635419,

[6] Of course, Plaintiff received explicit notice that Google and Meta tools were in use. *Supra* Part I.

at *5. Penning's attempt to invoke insurance-privacy statutes as a basis for heightened privacy protections fails for the same reasons discussed *supra* in Part II. The relevant statutes—IIPPA, GLBA, and CalFIPA—do not apply to Penning's limited interaction with the Website. Just as Penning fails to allege he is a "consumer" for purposes of GLBA and CalFIPA, he fails to allege—or even argue in the Opposition—that his interaction with the Website is an "insurance transaction" under IIPPA.[7] The Opposition again focuses on what types of transactions The Zebra *can* broker, but ignores that Penning did not engage in any such transaction. Opp. at 19. The Court previously instructed Penning to address this deficiency. Order at 2. His failure to do so warrants final dismissal.[8]

## V. Plaintiff's Pen Register Claim Must Be Dismissed.

### A. Plaintiff lacks a traditionally actionable harm from his alleged pen register claim.

The SAC fails to allege how The Zebra's conduct with respect to the pen register claim caused Penning a traditionally actionable privacy harm, as required for Article III standing. *See* Mot. at 6-8; *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021); *Popa v. Microsoft Corp.*, 153 F.4th 784, 792 (9th Cir. 2025). Courts routinely dismiss similar claims, finding no privacy interest in the information at issue—a required aspect of a traditional intrusion upon seclusion claim. *See* Mot. at 8 n.4.

The Opposition first argues that "it does not matter whether [Plaintiff] had a reasonable expectation of privacy in the information collected." Opp. at 7 (citing *Deivaprakash v. Conde Nast Digital*, 798 F. Supp. 3d 1100 (N.D. Cal. 2025)). This is incorrect. *Deivaprakash* evaluated *statutory standing* (CIPA § 637.2)—*not* Article III standing. And that decision cautioned that "Article III standing is different from, and not to be measured by, statutory standing." *Id.* at 1107 (citing *Khamooshi v. Politico LLC*, 786 F. Supp. 3d 1174, 1182 n.5 (N.D. Cal. 2025)). Penning cannot eschew the core traditional harm principle of "expectation of privacy" on the basis of a different inapplicable standing test. Moreover, *Deivaprakash* turned on allegations that user profiles generated by third parties hindered users' ability to remain anonymous online. *Id.* at 1107. Penning did not have

[7] The IIPPA applies only to information collected "in connection with an insurance transaction," which requires either (1) determination of eligibility for coverage, or (2) servicing of an insurance application or policy. Cal. Ins. Code § 791.02(m).

[8] Plaintiff makes a final half-hearted attempt to vaguely invoke enhanced privacy protections for personal, financial information, but fails to identify any such financial information actually captured. (Opp. 19-20, referring back to argument concerning motion to transfer).

the same expectation to remain anonymous when visiting The Zebra's Website. On the contrary, he voluntarily identified himself in the course of filling out the Website's form.[9]

Ignoring the critical inquiry of whether Penning had a valid expectation of privacy in the information at issue, the Opposition instead offers a theory of harm based on the linking of Website visitor information to "comprehensive, non-anonymous profiles," which purportedly caused Penning to lose the ability to control his personal information. Opp. at 7-8. But the Opposition's cited cases involved far more invasive tracking than the harm alleged here. For example, *Gilligan v. Experian Data Corp.* is one of many cases where the scale of collection and sharing went beyond reasonable privacy expectations. *E.g.*, *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020) (concerning "cradle-to-grave" profiling across countless websites). The *Gilligan* plaintiff alleged that the defendant had compiled detailed user profiles by tracking users across many websites, that were then disclosed on a large scale and sold commercially. 2026 WL 32259, at *2. But this is not a case where The Zebra itself compiled detailed user profiles or sold any data. Nor is it a case where The Zebra's conduct resulted in Penning's activity being tracked across many different websites. The Zebra's alleged conduct is limited to a minimal amount of information, collected only in the narrow scope of a user's interactions with TheZebra.com. Several courts have found that broad, cross-website tracking differs from non-sensitive browsing activity on a single website for purposes of Article III standing. *See Dawidzik v. Tesla, Inc.*, No. cv 25-1982, 2025 WL 3786963, at *4 (C.D. Cal. Dec. 29, 2025) (no standing based on third parties' profiling of users for targeted advertising, where defendant deployed pixels that transmitted data to third parties servers only when the user visited defendant's website); *Semien v. PubMatic Inc.*, No. 25-cv-3164-SI, 2026 WL 216333, at *5 (N.D. Cal. Jan. 27, 2026) (distinguishing defendant's creation of detailed user profiles and tracking across the internet from the single website alleged in *Popa*); *Krzyzek v. OpenX Techs., Inc.*, No. 25-cv-05588-SI, 2026 WL 206855, at *3 (N.D. Cal. Jan. 27, 2026) (similar).

Penning's interactions with The Zebra are also distinguishable from cases like *Gabrielli v. Motorola Mobility LLC*, No. 24-cv-9533-JST, 2025 WL 1939957 (N.D. Cal. July 14, 2025), which

[9] Again, this is all somewhat academic as Penning also necessarily agreed to the Privacy Policy, which disclosed the collection of identifier information to enable analytics and subsequent ad-targeting to site visitors. *Supra* Part I. He had no expectation of privacy as to this information.

found that the plaintiff established Article III standing by alleging that the defendant ignored the plaintiff's rejection of cookies and still placed them on the plaintiff's device. *Id.* at *6. Penning has not alleged here that the Website made contrary representations about its treatment of user data, or that he expressly rejected disclosure of such information to third parties. In fact, The Zebra's Privacy Policy disclosed, and Penning assented to, such disclosure. Penning did not suffer a consequent "loss of control" over his personal information that would support a concrete harm for Article III standing.

**B. The pen register statute does not apply here.**

Even if Penning could establish standing (he does not), he still fails to state a pen register claim. There is currently no binding appellate precedent that supports the application of Cal. Penal Code § 638.51 to the Meta and Google technologies at issue here. *See* Mot. at 22. Instead, the number of state court decisions rejecting Plaintiff's theory has continued to grow, and those decisions expressly distinguish certain of the federal district court authorities on which Penning relies. *See id.* at 22-24 & n.14 (collecting cases); *Blalock v. EquipmentShare.com Inc.*, 2026 WL 330067 (Cal. Super. Jan. 27, 2026) (sustaining demurrer because "purpose of the statute is to prevent the use of pen registers and trap and trace devices on *telephones*"; distinguishing *Shah v. Fandom*); *Cammorata v. Sonifi Solutions, Inc.*, No. 25STCV25259, 2026 WL 500856 (Cal. Super. Feb. 18, 2026) (sustaining demurrer because alleged trap and trace device identified *source* of electronic communication, meaning "simply the type of technology Plaintiff used to access Defendant's website," and revealed no personally identifying information). The ambiguous statutory language and increasing number of "conflicting rulings" creates a grievous uncertainty, such that "companies have no way of telling whether their online business activities will subject them to liability." *Doe v. Eating Recovery Ctr. LLC*, 806 F. Supp. 3d 1109, 1112 (N.D. Cal. 2025).

Binding authority may be on the horizon, though. Following denial of a demurrer in a CIPA pen register action, a defendant filed a petition for writ of mandamus, asking for review of whether the statute applies to online technologies like those at issue here. The California Courts of Appeal, Second Appellate District, recently issued an order to show cause for "why the relief sought in the petition should not be granted." *See Variety Media, LLC v. the Super. Ct. of Los Angeles Cty.*, Case No. B350578 (Jan. 8, 2026). The plaintiff, who is also represented by Bursor & Fisher, is due to

respond by March 11, 2026. In fact, Penning's counsel has stipulated to a stay of litigation in other matters concerning pen register claims, pending the *Variety* appeal. *See, e.g.*, Order Granting Stip. to Stay Case Pending Ruling from California Court of Appeal (Dkt. 82), *Fregosa v. Mashable, Inc.*, No. 25-cv-1094-CRB (Feb. 19, 2026). The Court may wish to take the same approach, here.[10]

**C. Google and Meta do not collect DRAS information.**

The SAC fails to adequately allege that Google or Meta collect "dialing, routing, addressing, or signaling" ("DRAS") information, as required to state a pen register claim. *See* Cal. Penal Code § 638.50(b); Mot. at 24-25. Again, the Court need not reach this issue because none of the information allegedly collected—users' "Facebook ID, Google ID, hashed e-mail, and browser fingerprints" (SAC ¶ 173)—are sufficient to confer standing. *Supra* Part V.A; Mot. at 7-8. But this is also not DRAS information. Aside from citing cases that did not directly consider the question, the Opposition makes no effort to explain how any of these categories of information are necessary for routing or addressing the alleged communication at issue. Opp. at 23-24. Plaintiff's attempt to distinguish *Tsering v. Meta Platforms, Inc.*, No. 25-cv-1611-RFL, 2026 WL 89320 (N.D. Cal. Jan. 12, 2026) also falls short. *Tsering* did not dismiss the pen register claim simply for failing to allege an at-issue communication; it rejected the claim because the plaintiffs "allege[d] only that Meta's SDKs collected users' geolocation data, 'unique device identifiers,' 'device fingerprint data,' and 'personal information,'" but there was "no allegation that this information is *used* for 'dialing, routing, addressing, or signaling.'" *Id.* at *6 (emphasis added). So too here.

## VI. CONCLUSION

For the foregoing reasons, The Zebra respectfully requests the Court dismiss the SAC.

Dated: February 27, 2026

VINSON & ELKINS LLP

By: *Christopher W. James*
Christopher W. James

*Attorney for Defendant*
*InsuranceZebra, Inc., d/b/a The Zebra*

---

[10] Plaintiff ignores that his pen register claim is contradicted (and barred) by allegations that Meta and Google collect content. *See* Mot. at 24 n.15. While Defendant disputes collection of any "content," the allegation contravenes the pen register statute. A pen register is expressly defined as a device that collects DRAS information but does *not* collect content. *See id.* (collecting citations).